Manassas

LAURA BARKEY

v.

COMMONWEALTH OF VIRGINIA,
ALEXANDRIA DEPARTMENT OF HUMAN SERVICES,
DIVISION OF SOCIAL SERVICES

No. 0290-85

Decided August 5, 1986

COUNSEL

Thomas J. Bepko, Jr., for appellant.

David W. Dunlap, Assistant Commonwealth's Attorney, City of Alexandira, for appellee.

OPINION

**COLE, J.**— The issue in this appeal is whether the trial court erred in terminating the residual parental rights of Laura Barkey to her six year old son. She asserts that the evidence was not sufficient to warrant termination of her residual parental rights in accordance with Code §§ 16.1-283(C)(1) and (2)(a) and (b). We disagree and affirm.

Laura Barkey's son, David, was removed from her home on January 3, 1983, because of her severe emotional problems. In accordance with Code § 16.1-281 the Alexandria Division of Social Services filed a foster care plan with the Alexandria Juvenile and Domestic Relations District Court on April 15, 1983. The program goal was to return the child to the parent and the target date for goal achievement was January, 1984. The plan listed the following responsibilities of the parent:

1. Mrs. Barkey will attend the Day Treatment Program at the MHC and take prescribed medication (until terminated by the Center).

2. Mrs. Barkey will visit David bimonthly.

3. Mrs. Barkey will meet with the social worker monthly.

On January 27, 1984, this foster care plan was reviewed and the program goal was changed to adoption. The review disclosed that the former goal was not met since Mrs. Barkey did not follow through with her Day Treatment Program and did not maintain contact with David. During the period that David was with his foster parents he was happy and well adjusted. He made progress intellectually and his increased I.Q. scores were attributed to a successful placement in foster care. The reasons stated by the social worker for the change in goals were:

David Basham came into care because his mother, Mrs. Laura Barkey, is severely mentally ill and unable to care for him. Mrs. Barkey has shown very little interest in David since his removal, only visiting once and only after I encouraged her. Mrs. Barkey refuses to participate in psychotherapy or involve herself with the day treatment program at the Alexandria Mental Health Center. Instead, Mrs. Barkey lives in a world of her own, adamantly denying a need for help. Mrs. Barkey resides with her mother and father. David's legal father, Jimmy Basham, left Mrs. Barkey, taking the couple's four sons. He left David because he was not the child's natural father. Mrs. Barkey has not identified David's father.

David has maintained a regular relationship with his grandmother, Mrs. Richard Barkey. Mrs. Barkey cannot provide a home for David as she works at two jobs and is additionally responsible for her alcoholic husband and mentally ill daughter. Contact has been made with Mr. Raymond Barkey, David's uncle, in an effort to place him with a relative. Mr. Barkey did not respond and according to Mrs. Richard Barkey is having marital problems.

Since Mrs. Laura Barkey is unable to care for David and no relatives seem suitable, adoption is the only goal offering permanency to this child.

The Alexandria Division of Social Services filed a petition in the Alexandria Juvenile and Domestic Relations District Court to terminate the residual parental rights of Jimmy Basham and

Laura Barkey. A hearing was held on October 10, 1984, and an order was entered the same day by the court terminating the residual parental rights of both Jimmy Basham and Laura Barkey. Laura Barkey appealed this decision to the Alexandria Circuit Court. Basham did not appeal and the decision is now final as to him. A *de novo* hearing was held in the circuit court on January 31, 1985, and the court entered an order on February 15, 1985, terminating the residual parental rights of Laura Barkey pursuant to Code § 16.1-283(C)(1) and (2)[1].

Barkey admits that the evidence adduced at trial was sufficient to establish clearly and convincingly that she was suffering from a psychiatric illness at the time the child was placed in foster care. She claims that the illness continued in various stages until the time the circuit court terminated her residual parental rights. She argues that given this mental state, she should not be held responsible for her conduct which necessitated the placement of her son into foster care. She contends that her illness constitutes "good

---

[1] Code § 16.1-283 reads in pertinent part as follows:

C. The residual parental rights of a parent or parents of a child placed in foster care as a result of court commitment, an entrustment agreement entered into by the parent or parents or other voluntary relinquishment by the parent or parents may be terminated if the court finds, based upon clear and convincing evidence, that it is in the best interests of the child and that:

1. The parent or parents have, without good cause, failed to maintain contact with and to provide or substantially plan for the future of the child for a period of twelve months after the child's placement in foster care notwithstanding the reasonable and appropriate efforts of social, medical, mental health or other rehabilitative agencies to communicate with the parent or parents and to strengthen the parent-child relationship; or

2. The parent or parents, without good cause, have been unwilling or unable within a reasonable period to remedy substantially the conditions which led to the child's foster care placement, notwithstanding the reasonable and appropriate efforts of social, medical, mental health or other rehabilitative agencies to such end.

Proof of any of the following shall constitute prima facie evidence of the conditons set forth in subparagraphs C 1 or 2 hereof:

a. The parent or parents have failed, without good cause, to communicate on a continuing or planned basis with the child for a period of twelve months; or

b. The parent or parents, without good cause, have failed or have been unable to make reasonable progress towards the elimination of the conditions which led to the child's foster care placement in accordance with their obligations under and within the time limits or goals set forth in a foster care plan filed with the court or any other plan jointly designed and agreed to by the parent or parents and a social, medical, mental health or other rehabilitative agency.

In 1985 this section was amended to substitute "subsections" for "subparagraphs" in the second paragraph of (C)(2).

cause" under the terms of the statute and fully explains why she failed to maintain contact with her son and to remedy the situation which led to foster care. She argues that her case is not one where the parent does not care for the child, but rather is one in which, because of mental illness, the parent was unable to do the things requested, and that the language in the statute, "without good cause," was intended to prevent the termination of parental rights in cases of this nature.

A review of the evidence reveals that on October 4, 1982, Michael Heilmann, a social worker with the Alexandria Community Mental Health Center (MHC), tried to engage Barkey in parent counseling as part of the Therapeutic Nursing Program for her son, David. Heilmann reported that he "soon became aware that Ms. Barkey had trouble relating to everyone, including her son," and that he "felt a need to report her to Child Protective Services on December 1, 1982, because of apparent insensitivity to son's physical and emotional needs." He continued to reach out to her, hoping that she would accept psychotherapy and psychotropic medication, but he was not able to engage her and found that she believed medication would have a detrimental effect. Heilmann attempted to engage her in the Day Treatment Program; she attended briefly, but then dropped out.

On January 27, 1983, Barkey independently appeared at MHC, inquired about her court ordered evaluation, and was reviewed for emergency medication therapy. The medical doctor who examined her did not prescribe medication due to her previous history of major dystonic side effects that would require close monitoring and her general resistance to medication. On February 8, 1983, her social worker at MHC described her as fully cooperative with the interview process, but felt that her:

distant and drifting presence would actually cause her to fade away into some unknown world. She was unable to respond to questions directly. Numerous loose association were noted. Her memory for significant events was at best spotty. Her general thought processes were nonspontaneous, indecisive and ambivalent. She had numerous vague, somatic complaints, spasms, pinched nerves, earaches, floating feelings, blackouts which all indicate a possible subjective feeling of not being in control of oneself.

As a result of the evaluation, MHC recommended that Barkey, since she was able to remain with her parents, participate in the Adult Day Treatment Program, which would provide her with an intensive therapeutic regime to include individual, group, and medication therapy on a five day a week basis. This recommendation was embodied in the foster care plan provided for and agreed to by Barkey.

The trial court found upon clear and convincing evidence that termination of the residual parental rights was in the best interest of the child; that Barkey, without good cause, failed to maintain contact with and to provide or substantially plan for the future of the child for a period of twelve months after the child's placement in foster care; and that Barkey was unwilling or unable within a reasonable period to remedy substantially the condition which led to the child's foster care placement. These deficiencies were found to exist notwithstanding the reasonable and appropriate efforts of social, medical, and mental health and other rehabilitation agencies to communicate with the parent and to strengthen the parent-child relationship.

While not disagreeing that the appellee has made out a case for terminating parental rights, Barkey contends that she has recently made substantial improvement in her mental condition, is now employed, and can take care of David. Her mother, Lydia Barkey, testified that during the past several months Laura had received mental health treatment, had progressed significantly, was no longer severely withdrawn and was employed. She stated that Laura now lived with her and that if David was returned to the mother, she would be able to care for him while Laura worked.

Barkey testified that she did seek help at the Alexandria Mental Health Center and came under care of Dr. Robert Ketcham in the spring of 1984. In the fall of 1984, she was referred to the Day Treatment Program. Dr. Ketcham prepared a report dated January 15, 1985, outlining his treatment. His conclusion, however, was that she would "need 6-8 months of regular, ongoing attendance in a more structured effort like the Day Treatment Program to make even the beginnings of a substantive change." Shortly before the hearing on January 31, 1985, she left the program to seek employment.

The Commonwealth contends that *Toombs* v. *Lynchburg Division of Social Services,* 223 Va. 225, 288 S.E.2d 405 (1982), addressed an almost identical situation and affirmed the termination of parental rights of the mother because her psychological problems continued to preclude her from properly caring for her children. In *Toombs,* it was clear from the record that the mother's psychological problems prevented her from functioning properly as a parent. There was evidence that her condition had improved, but she was still unable to care for her children properly due to her mental status and her intellectual abilities. The Supreme Court found that the evidence supported the trial court's finding that the failure to remedy the condition that led to foster care placement was without good cause. *Id.* at 233, 288 S.E.2d at 409.

■ Code § 16.1-283(C), previously set forth,[2] prescribes the conditions under which parental rights may be terminated. Barkey's position would inevitably lead to the conclusion that residual parental rights could never be terminated if a parent suffered from a mental illness, since the condition would, by definition, constitute "good cause" for the failure to shoulder responsibilities of parenthood. In a different factual context, this same question was presented in *Toombs,* and the Supreme Court concluded that:

> The question must be resolved, however, in light of the facts of each case, with the best interests of the child as the guiding principle.

223 Va. at 230, 288 S.E.2d at 407-08.

■ In determining what is in the best interests of the child, a court must evaluate and consider many factors, including the age and physical and mental condition of the child or children; the age and physical and mental condition of the parents; the relationship existing between each parent and each child; the needs of the child or children; the role which each parent has played, and will play in the future, in the upbringing and care of the child or children; and such other factors as are necessary in determining the best interests of the child or children. In this case the trial court had to consider many factors in deciding what was in the best interests of the child and what constituted "good cause" under the

---

[2] *See* note 1 *supra.*

statute. In *Harris* v. *Lynchburg Division of Social Services*, 223 Va. 235, 288 S.E.2d 410 (1982), Harris contended that since she was in prison, it was impossible for her to care for her children, and hence, her failure to remedy the condition that led to foster care was not without good cause. The Supreme Court stated that:

> We will not allow Harris, however, to use her incarceration as reason to excuse her prior neglectful treatment of her children or to say that her failure to remedy the conditions in her home was without good cause.

*Id.* at 242, 288 S.E.2d at 414.

We believe that there is ample evidence in the record to support the finding of the trial court that termination of residual parental rights in this cause was in the best interests of David. The record does not reflect why David was in the mental health therapeutic nursery program, but we do know that after he was placed with foster parents a dramatic change took place. Sandra Corry, a social worker with the Alexandria Division of Social Services, stated that since his placement in foster care his I.Q. scores improved tremendously. His foster parent, Adeline Trickey, testified that David improved in foster care, that he now had a number of friends, and that he was in the top reading group at school. In summary, whereas prior to his placement in foster care, David was in a position where his development and growth were in jeopardy, he now is progressing normally, is rapidly improving, and his future seems assured. There is ample evidence to support the finding of the trial court that it was in the best interests of David that the parent's residual parental rights be terminated.

There is clear and convincing evidence in the record to support the finding of the trial court that Barkey, without good cause, failed to maintain contact with and to provide or substantially plan for the future of the child for a period of twelve months after the child's placement in foster care, notwithstanding the reasonable and appropriate efforts of the agencies to communicate with the mother and to strengthen the parent-child relations. David was removed from the Barkey home on January 3, 1983. The foster care plan dated April 13, 1983, provided for the mother to visit David bimonthly. She did not maintain contact with the child or the agency on a regular basis, and visited the child only three

times within the twelve month period. The record discloses that there were ample services offered and available to Barkey, but she chose not to take advantage of them. The law does not require the division to force its services upon an unwilling or disinterested parent. *Harris* v. *Lynchburg Division of Social Services*, 223 Va. at 243, 288 S.E.2d at 415.

There is also ample evidence in the record to support the finding of the trial court that the mother, without good cause, was unwilling or unable within a reasonable period to remedy substantially the conditions which led to the child's foster care placement. The record makes it abundantly clear that Barkey refused to accept treatment for her mental illness before and after the child was placed in foster care, and that at the time of the trial, had dropped out of the Day Treatment Program to accept employment. Dr. Robert Ketcham, in his report dated January 15, 1985, stated that: "She will need 6-8 months of regular, ongoing attendance in a more structured effort like the Day Treatment Program to make even the beginnings of a substantive change." When Barkey dropped out of this program prior to the hearing in the trial court, she diminished the reasonable probability that there would be improvement in her mental condition within a reasonable period of time.

For the reasons assigned, the order terminating the residual parental rights is affirmed.

*Affirmed.*

Duff, J., and Keenan, J., concurred.