COURT OF APPEALS OF VIRGINIA


Present:  Judges Baker, Willis and Annunziata
Argued at Alexandria, Virginia


SUZANNE HUGHES

v.         Record No. 2345-94-4        MEMORANDUM OPINION[*]
                                    BY JUDGE JOSEPH E. BAKER
DEPARTMENT OF SOCIAL SERVICES         FEBRUARY 6, 1996
 ARLINGTON COUNTY


            FROM THE CIRCUIT COURT OF ARLINGTON COUNTY
                 William T. Newman, Jr., Judge

          Deborah E. Kramer, for appellant.

          Mary E. Craig, Assistant County Attorney,
          for appellee.


     Suzanne Hughes (appellant) appeals from a judgment of the
Circuit Court of Arlington County (trial court) that terminated
her parental rights to her daughter (the child).  Appellant
contends that she was denied due process; that the trial court
erred in permitting her to be cross-examined concerning her
experiences with a cult, and in finding that her neglect and
abuse of the child had not and could not be substantially
corrected or eliminated within a reasonable period of time.  She
further alleges that the trial court, in arriving at its
conclusion, wrongfully considered evidence that appellant's
"father yelled at her when she was a young girl" and that "the
man who repeatedly raped [her] when she was a young girl and
again in 1993" was still at large.

─────────────
     [*]Pursuant to Code § 17-116.010 this opinion is not
designated for publication.

On September 29, 1990, the child, then five months old, was placed in foster care as the result of an emergency removal. On October 1, 1990, the county filed an abuse and neglect petition. It alleged that appellant physically assaulted the child and could not cope with caring for her. Appellant has been diagnosed as suffering from myoclonus, a movement disorder, an eating disorder, a substance abuse problem, borderline personality disorder, and emotional problems later diagnosed as multiple personality disorder. Dr. Janieth Wise treated appellant for her multiple personality disorder and eventually reported to the county that appellant was capable of parenting the child. The county retained Dr. M. Kathryne Jacobs, a psychologist with expertise in early childhood development, to work with appellant and the child. On February 3, 1992, the child was returned to appellant. On May 29, 1992, the child was returned to foster care after further incidents of neglect and abuse. After the child was removed from appellant's custody, Dr. Jacobs described the child as suffering from separation anxiety disorder, temper tantrums, an inability to eat and sleep, and clinical depression.

Following the second removal of the child from appellant, the Department of Social Services' (DSS) goal was still to return the child to appellant; however, concern for the child's well-being caused the DSS to change its goal from the return of the child to appellant to adoption.[1]

[1]The child's father, Bruce Stewart, voluntarily surrendered his parental rights on May 3, 1993.

In July 1992, at a hearing, Dr. Wise testified that appellant had told her of appellant's interactions with a satanic cult. Appellant and Dr. Wise elaborated, describing incidents appellant witnessed in which cult members killed adults and babies, times when multiple perpetrators had sex with appellant, and times when she experienced death threats and the like. Appellant did not deny these occurrences.

Appellant said that the abuse started when she was seven years old. Marianne O'Connell, a social worker, testified that in October 1992, appellant told her that "the night that you removed [the child], I returned to the cult."

Throughout the latter part of 1992 and into 1993, appellant was repeatedly in and out of hospitals. Appellant testified that during a break between hospital stays, during Christmas 1992, Dwight McMillan, a relative by marriage who had previously abused her for years as a member of the satanic cult, and other cult members, abducted and raped her and then dropped her back at the site where she had been abducted. Appellant believed McMillan to be hiding from authorities in Canada.

Between March 2, 1993 and June 23, 1993, a judge of the Juvenile and Domestic Relations District Court for the County of Arlington (district court), over a four-day period, heard evidence relating to the termination of appellant's parental rights, after which the court ordered a continuance of the case to allow for more time to evaluate appellant's progress and the

impact of her mental condition on her parenting skills.  On
January 31, 1994, after a six-month continuance, appellant's
residual parental rights were terminated by the district court.
Appellant filed notice of appeal to the circuit court where the
child's foster parents filed a motion to be notified of and for
leave to participate in all proceedings.  The motion was granted.

At the circuit court trial, Dr. Jacobs testified that
following the termination hearings in district court, the child,
who had been confused and uncertain about where she would live
and who would be her mommy, began to recover from her separation
anxiety disorder.  She slept through the night and for the first
time began to take an interest in other children and in the toys
during therapy sessions.  Dr. Jacobs described her as "no longer
clinically depressed.  She was no longer showing the symptoms of
the reactive attachment disorder."  When queried at trial
concerning the child's own desires about her living
circumstances, Dr. Jacobs stated "[The child] has never been
ambivalent about what she wants. . . . She has a momma and a
dadda, that she lives with, the [foster parents], and she has a
person that she calls mommie Suzie that she is attached to."  Dr.
Jacobs described the child's bond with her foster parents as "a
primary, primitive, primal attachment of a child to the first
human beings that gave her consistent, appropriate nurturing and
care.  They are her psychological parents. . . . They're her
mother and father and that's how she feels toward them."

The trial court, over appellant's objections permitted the county to cross-examine appellant about her involvement/ victimization by the satanic cult and about her parents' knowledge of the cult's abuse of her when she was a little girl and her parents' failure to contact the police at that time. At the time of the trial court hearings, appellant lived at her father's house on the weekends.

A psychological evaluation to assess appellant's prognosis, as to her ability to parent, was conducted in September and October 1992, by Dr. Mary L. Froning, an expert in the areas of psychology, multiple-personality disorders, and child psychology. The doctor testified at the circuit court that she concluded from those evaluations that appellant was not able to parent at that point and recommended that she continue therapy and be re-evaluated within one year. Dr. Froning stated that a person with a complicated multiple personality disorder would typically take five to seven years to recover from the disorder.

On October 18, 1994, the trial court ruled that appellant's residual parental rights should be terminated. In making this ruling, the trial judge addressed his concern over the continued existence of the satanic cult, appellant's inability to help the police prosecute a member of this cult, appellant's continued residence in the same family home where she had been verbally and physically abused as a small child, and lack of family support that was missing when appellant was an abused child.

We have examined the record in this case, including the details of the various foster care plans required by law, and we find there has been no denial to appellant of due process rights.

Whether evidence is admitted or refused is left largely to the sound discretion of the trial court. We hold that evidence of appellant's participation in the cult described was relevant to these proceedings and that the trial court did not abuse its discretion in permitting appellant to be examined on that subject.

In this case, the child came into care at an extremely early age and lived with her mother for a total of nine months out of her five plus years. Dr. Jacobs testified that during the most important formative years of her life, the child became attached to her foster family and established a primal bond. Dr. Jacobs opined:

> It's too late. The critical period is
> passed. [The child] is four years old. She
> has made her own emotional bond. It would be
> an extreme trauma to her to be placed with
> someone else for reasons that don't make any
> sense to her. She also has a history with
> [appellant] which causes her to mistrust
> giving herself into the care of [appellant].
> So even though our criteria might be met,
> you know, [the child's] criteria wouldn't be
> met, either biologically or emotionally.

There is substantial evidence to support the trial court's decision. Appellant asserts that she should be allowed more time to show that she could be suitable to parent the child.

What is a reasonable period of time depends upon the context

and circumstances of each case.  Virginia Ass'n. of Ins. Agents
v. Commonwealth, 187 Va. 574, 579, 47 S.E.2d 401, 404 (1948).
Under the circumstances of this case, the trial court did not err
in refusing to delay its decision.  Appellant argues that her
illness has a predicted five-year cure.  From this record, the
reality is that there is a three- to five-year treatment plan
with an uncertain outcome.

The primary question always is what is in the best interest
of the child.

> [A] court must evaluate and consider many
> factors, including the age and physical and
> mental condition of the child or children;
> the age and physical and mental condition of
> the parents; the relationship existing
> between each parent and each child; the needs
> of the child or children; the role which each
> parent has played, and will play in the
> future, in the upbringing and care of the
> child or children; and such other factors as
> are necessary in determining the best
> interest of the child or children.

Barkley v. Alexandria Dep't. of Soc. Servs., 2 Va. App. 662, 668,
347 S.E.2d 188, 191 (1986).

Although maintenance of the family structure in all possible
circumstances is important in Virginia, the code recognizes,
however, that there are circumstances in which this is not likely
to occur.  "It is clearly not in the best interest of a child to
spend a lengthy period of time waiting to find out when, or even
if, a parent will be capable of resuming his responsibilities."
 Kaywood v. Dep't. of Soc. Servs.,  10 Va. App. 535, 540, 394

S.E.2d, 492, 495 (1990).[2]

The testimony of Dr. Jacobs, the social worker, and the foster mother makes it clear that the child needs a mother who can put her interests first and offer her sensible, safe, consistent, responsible parenting. The child had formed a primal attachment to the foster family over many years in their care. Whatever bond remains with her mother is ambivalent and fraught with mistrust. It is clear in this case that the child regards her foster parents as her mother and father, and it would likely do irreparable harm to her to remove her from her home and send her to an uncertain future with a mother who is still struggling with serious mental health issues.

For the reasons stated, the judgment of the trial court is affirmed.

<u>Affirmed.</u>

---

[2]The record discloses that post-trial, appellant continues to have unresolved problems. She remains in therapy for multiple disorder and borderline personality disorder. By filing a motion to reinstate visitation rights pending appeal, appellant opened the door for a discussion of her present emotional stability. Appellant has demonstrated serious emotional instability since the circuit court trial. She was hospitalized following the trial; she made threats directed at the foster family and the social workers; and she has expressed to social workers an obsessive determination to inform the child that she intends to take her from the foster family.