## CIRCUIT COURT OF THE CITY OF RICHMOND

In re Larry Neblett, Jr.

Case Nos. HK-1205-A4 and HK-1210-A4

In re Lillie Mae Neblett

Case Nos. HK-1206-A4 and HK-1219-A4

November 24, 1999

BY JUDGE RANDALL G. JOHNSON

In these consolidated appeals from the Juvenile and Domestic Relations District Court of the City of Richmond, the court must decide whether to terminate residual parental rights. A *de novo* hearing was held on November 3.

The facts are not in dispute. Brenda Ruffin and Larry Neblett are the parents of Lillie Mae Neblett, age 11, and Larry Neblett, Jr., age 9. Ms. Ruffin suffers from cerebral palsy and mental retardation. Mr. Ruffin suffers from schizophrenia and various physical ailments. Because of their long-standing physical and mental problems, the parents voluntarily entrusted the children to the Richmond Department of Social Services (RDSS) in September 1990, and custody was awarded to RDSS by the juvenile court.

From 1990 to 1998, RDSS submitted a series of foster care plans to the juvenile court. For the first three years, the goal of each plan was "Placement with Relatives." In December 1994, after it became obvious that there were no suitable relatives with whom the children could be placed, the goal was changed to adoption. The last plan was submitted in April 1998. In July 1998, the juvenile court approved the goal of adoption for Lillie Mae Neblett over the parents' objections but disapproved the goal of adoption for Larry Neblett, Jr., the court noting that there "was no evidence that this child was adoptable." The parents noted an appeal of the juvenile court's approval of the plan for

Lillie Mae, and RDSS appealed the court's disapproval of the plan for Larry, Jr.

On December 12, 1998, the parties and their counsel appeared in this court for a *de novo* hearing on the appeals. Before the hearing started, counsel announced that the parties had agreed to attempt mediation in order to explore the possibility of continuing contact between the parents and their children while still pursuing adoption. In fact, it was the hope of the parents and RDSS that adoptive parents could be found who would be willing to allow the children to continue to have contact with their parents even after the adoption took place. A consent order memorializing the parties' agreement and remanding the cases to the juvenile court was signed on March 10, 1999. On June 17, 1999, as part of the adoption process, RDSS petitioned the juvenile court for termination of the parents' residual parental rights. Based on the parties' previous agreement and on RDSS' continued representations that it would attempt in good faith to find adoptive parents who would be willing to allow the children to maintain contact with their natural parents — in fact, it was thought that such prospective parents had already been found — the parents did not contest the court-ordered termination of their parental rights. This was with the understanding, however, that the parents could appeal such termination if the then-identified prospective parents decided not to allow continued contact and if new prospective parents willing to allow continued contact could not be found within a reasonable time. In fact, the parents filed their notices of appeal on June 24, 1999, the same day their parental rights were terminated by the juvenile court. Later, the then-identified prospective parents decided not to go through with the adoption, and RDSS' search for other prospective parents willing to allow continued contact with the natural parents has been fruitless. Accordingly, the termination of parental rights issue is now squarely before this court.

Virginia Code § 16.1-283(C)(2) provides, in pertinent part:

> The residual parental rights of a parent or parents of a child placed in foster care as a result of court commitment, an entrustment agreement entered into by the parent or parents or other voluntary relinquishment by the parent or parents may be terminated if the court finds, based upon clear and convincing evidence, that it is in the best interests of the child and that ... .
>
> 2. The parent or parents, without good cause, have been unwilling or unable ... to remedy substantially the conditions which led to or required continuation of the child's foster care placement,

notwithstanding the reasonable and appropriate efforts of social, medical, mental health or other rehabilitative agencies to such end.

The parents concede that they are mentally and physically unable to take care of their children, that is, that they are "unable ... to remedy substantially the conditions which led to or required continuation of the child[ren]'s foster care placement." They point out, however, that such inability is the result of their physical and mental conditions, conditions inflicted upon them by nature, not by any voluntary act of theirs. Thus, they argue, such inability cannot be said to be "without good cause." The court agrees.

As the statute mandates, and as is true in most civil cases involving juveniles, the paramount concern is the best interests of the children. *Barkey v. Commonwealth*, 2 Va. App. 662, 347 S.E.2d 188 (1986). Indeed, RDSS makes a strong argument that it is in Lillie Mae's and Larry, Jr.'s best interests to be adopted. The court, however, cannot ignore the rest of the statute. Particularly where something as important and irreversible as the termination of parental rights is concerned, the entire statute must be obeyed. The statute requires the court to find by clear and convincing evidence that termination is in the children's best interests *and* that the parents' failure to "remedy substantially the conditions which led to or required continuation of the child[ren]'s foster care placement" is "without good cause." Only by reverting to the thinking of medieval times can it be said that the inability of these parents to remedy the conditions which led to their children's foster care placement is without good cause. Mental retardation and mental illness are not the fault of the persons suffering from them. Neblett and Ruffin are also not responsible for their physical ailments. As one of the social workers testified, there is no program RDSS can offer and absolutely nothing these parents can do to improve their situations or make it likely that they will ever be able to care for their children. It simply cannot happen. Still, it is not their fault. It is not without good cause.

*Toombs v. Lynchburg Division of Social Services*, 223 Va. 225, 288 S.E.2d 405 (1982), and *Barkey v. Commonwealth*, 2 Va. App. 662, 347 S.E.2d 188 (1986), also involved parents with mental illnesses which, according to them, prevented them from remedying the conditions leading to the foster care placements of their children. In *Toombs*, the trial court terminated the parental rights of a mother with a history of mental problems, including "borderline mental retardation" and "schizoid personality disorder," and a father who was recently released from prison. In *Barkey*, the mother had an unspecified, but severe, mental illness. The natural father was not identified. In each case, the mother argued that it was her mental illness that

prevented her from remedying the conditions leading to her child's foster care placement, thereby precluding the "without good cause" finding required by the statute. In each case, the appellate court rejected the mother's argument. But in each case, the court specifically found that the mother had failed to do things she could have done to make the situation better.

In *Toombs*, the social services investigator reported that the parents had "an uncooperative attitude" that made it difficult to observe the "interaction between the natural parents and the children to determine [their] psychological attachment." 223 Va. at 229-30. The record also showed that the relationship between the parents and their children "deteriorated during that period, due, in substantial part, to the infrequency with which the parents exercised their visitation rights." *Id.* at 231. The court also noted a report from a mental health clinic that questioned whether the mother "really wants the responsibility for her children." *Id.* at 233.

In *Barkey*, the court found that in spite of the reasonable efforts of public agencies to treat the mother's mental illness, thereby helping to remedy the condition that led to her child's placement in foster care, the mother had refused.

> The record makes it abundantly clear that Barkey refused to accept treatment for her mental illness before and after the child was placed in foster care, and that at the time of the trial, had dropped out of the Day Treatment Program to accept employment. Dr. Robert Ketcham … stated that: "She will need 6-8 months of regular, ongoing attendance in a more structured effort like the Day Treatment Program to make even the beginnings of a substantive change." When Barkey dropped out of this program prior to the hearing in the trial court, she diminished the reasonable probability that there would be improvement in her mental condition within a reasonable period of time.

2 Va. App. at 670.

Unlike the mothers in *Toombs* and *Barkey*, the parents in the cases at bar have not failed to do anything that they are physically and mentally able to do to improve their conditions, including undergoing all medical and mental health treatment offered to them. They also visit with their children often and are genuinely concerned about their children's welfare. While they want their children to be adopted, they do not want to lose contact with them. Although the children were not in court during the hearing, the evidence presented makes it clear that they also love their parents. They want to be adopted, but

they also want continued contact with their parents. In fact, on a "Thinking of You" card recently given to their parents, Lillie wrote:

> Dear Mom and Dad,
> I hope you and me [sic] have a nice visit together. I miss you very much. I hope we have a nice visit. Love you very much.
>
> > Love,
> > Lillie

Larry, Jr. wrote:

> Dear Mom,
> I know you feel sad, but I will always remember.
>
> > Love,
> > Larry

In sum, the court cannot find by clear and convincing evidence that these parents have been unwilling or unable, *without good cause*, to remedy substantially the conditions which led to the placement of their children in foster care. Because such a finding is necessary before parental rights can be terminated, they cannot be terminated here. The petitions of RDSS will be denied.