COURT OF APPEALS OF VIRGINIA


Present:   Judges Haley, McCullough and Senior Judge Willis


NEKETIA JACKSON

v.     Record No. 0472-11-3

LYNCHBURG DEPARTMENT OF SOCIAL SERVICES
                                                                  MEMORANDUM OPINION*
RODNEY SPRADLEY                                                          PER CURIAM
                                                                   SEPTEMBER 6, 2011
v.     Record No. 0473-11-3

LYNCHBURG DEPARTMENT OF SOCIAL SERVICES


FROM THE CIRCUIT COURT OF THE CITY OF LYNCHBURG
Mosby G. Perrow, III, Judge

(Gary M. Coates, on brief), for appellant Neketia Jackson.

(Ronald D. Henderson, on brief), for appellant Rodney Spradley.

(Susan L. Hartman, Assistant City Attorney; James C. Reeves, III,
Guardian *ad litem* for the minor children, on brief), for appellee.


Neketia Jackson (mother) and Rodney Spradley (father) appeal the trial court's orders

terminating their parental rights to their four children pursuant to Code § 16.1-283(C)(2).  They

contend the trial court erred in finding that the evidence was sufficient to prove that termination

was in the best interests of the children and that they were unwilling or unable within a

reasonable period of time to remedy substantially the conditions which led to the placement of

the children into foster care.  Upon reviewing the record and briefs of the parties, we conclude

that these appeals are without merit.  Accordingly, we summarily affirm the decisions of the trial

court.  See Rule 5A:27.

---

* Pursuant to Code § 17.1-413, this opinion is not designated for publication.

BACKGROUND

On appeal, we view the evidence in the light most favorable to the prevailing party below and grant to it all reasonable inferences fairly deducible therefrom. Logan v. Fairfax Cnty. Dep't of Human Dev., 13 Va. App. 123, 128, 409 S.E.2d 460, 462 (1991). "Where, as here, the court hears the evidence *ore tenus*, its finding is entitled to great weight and will not be disturbed on appeal unless plainly wrong or without evidence to support it." Martin v. Pittsylvania Cnty. Dep't of Soc. Servs., 3 Va. App. 15, 20, 348 S.E.2d 13, 16 (1986) (citations omitted).

Mother and father had four children together: two boys, R.S. (born October 21, 1999) and T.J.S. (born July 30, 2001); and two girls, T.S. (born March 24, 2003) and R.J.S. (born April 12, 2004). Mother and father are not married. In August 2007, father and mother separated, and father moved from the family's apartment into an apartment leased by father's girlfriend, who had a child of her own. Father later had a child with the girlfriend, and at the time of the hearing, father was still living with the girlfriend, who was pregnant with father's second child. The apartment lease is in the girlfriend's name. Although father no longer lived with mother and the children, he provided support and assistance.

The Lynchburg Department of Social Services (LDSS) became involved with mother and the four children in February 2008, after receiving a child protective services (CPS) complaint that the youngest child, R.J.S., then not quite four years old, was playing outside unsupervised. A CPS worker visited mother a few days later. Although mother was "not cooperative or receptive to services," she signed an agreement to provide adequate supervision to the children. On May 2, 2008, a man saw R.J.S. and T.S. outside mother's apartment unsupervised. One child was in a car playing with the gearshift while the other child was under the wheel of the car. The man reported the incident to CPS. When the CPS worker came to the house, mother was not

- 2 -

there. The oldest child (R.S.), then eight years old, was alone inside. Mother arrived in a car a few minutes later. Mother denied any wrongdoing or blame, but agreed to sign a safety plan.

On May 10, 2008, LDSS learned that mother was facing eviction due to rodent infestation. At that time, LDSS became aware of several additional complaints, such as the apartment walls were black with dirt, there was rotting food in the house, neighbors saw the children hanging out of the second story windows, and there were men and drug activity in and out of the residence between 6:00 p.m. and 4:00 a.m. Finally, it was reported that R.S. defecated on a neighbor's doorstep because he could not get into the apartment to use the restroom. Based on these complaints, a CPS worker spoke with mother about her concerns. Mother denied the complaints and continued to minimize the situation.

On May 13, 2008, mother and father agreed to a safety plan whereby the children were to live with father, and mother could visit them at father's home until LDSS said it was safe for them to return home. On May 16, 2008, LDSS received a call that the two girls were back at mother's apartment. LDSS arrived to remove the children, but mother and father had taken them to another location. When LDSS found them, they were with mother's aunt, who smelled of alcohol.

On May 16, 2008, LDSS removed the children and placed them in foster care. LDSS provided services to the parents and children and directed the parents to undergo psychological examinations, take parenting classes, attend counseling, abstain from illegal drug use, obtain safe housing, and find stable employment. The parents were permitted weekly visitation with the children on condition they produce negative drug screenings. Mother produced a negative screen in July 2008. Father was not able to do so until August 2008.

The initial foster care service plans had a goal of returning the children home. On January 19, 2010, twenty-one months after removing the children, LDSS amended the service

plan goal to termination with a goal of adoption, and it filed petitions in the juvenile and domestic relations district court (juvenile court) to terminate the parents' rights. On June 23, 2010, the juvenile court granted the termination petitions. The parents appealed, and the trial court conducted a *de novo* hearing on October 14, 2010.

LDSS foster care worker April Watson worked with the parents and children throughout the case and testified that mother completed a parenting class. Watson referred mother to a counselor (with Alliance for Families and Children) when the children first came into foster care. Although mother and the counselor met several times, mother did not follow up with that counselor, so Watson later referred mother to another counselor, Mary Rice. Mother also received in-home counseling from Jennifer Bointnott. Watson testified that mother did not maintain stable housing or employment during the more than two-year period LDSS had the case. Moreover, mother continued to maintain an abusive relationship with a man (Moore) in spite of Watson's repeated warnings that she stop putting herself and the children in such a situation. There were at least three incidents of abuse by Moore against mother in July 2009, October 2009, and March 2010.

Watson also testified that father did not maintain stable employment. She recalled he was employed from July 2008 until February 2009, but said there was a fifteen-month period where he was not employed. At the time of the hearing, father was living in his girlfriend's apartment with two children and a third child on the way. Father's marijuana use was a recurring problem throughout the case, and Watson stated that the child that father and his girlfriend had in May 2008 was "born prenatally exposed to marijuana." Moreover, throughout the case, father tested positive for marijuana three times, admitted consuming it nine times, and refused to take tests seven times. Father's most recent positive test was on June 23, 2010, and at the October 14, 2010 hearing, father admitted using marijuana "maybe a month ago."

- 4 -

Three of the parents' four children "have been diagnosed with ADHD, PTSD," and receive ongoing services to address their psychological needs. LDSS contacted several relatives to take custody of the children, but no one volunteered to do so. Watson observed several visitations between the parents and children and noticed that during the later visits the children would become upset after the visits. For example, she recalled the boys would cry, have nightmares or wet the bed and "it would take several days to adjust to school after visitation." Other times, the children would become upset because mother would complain that she had no money or food. When asked why LDSS supported termination Watson testified:

> They have been in care for 30 months, which is over the permanency timeline. The children, they want to know what is going to happen. They want a decision to be made. It is affecting them in school and other areas of their lives. . . . I have talked many times [with the parents] about what they need to do.
> I believe they love their children but I don't believe they took it serious[ly] enough and these children are just sitting and waiting and I don't think it is fair to them any more.

The two boys, R.S. and T.J.S., were placed together in a therapeutic foster home. T.S., the older female, was initially placed with her younger sister, R.J.S., in a regular foster home, but was moved to a therapeutic foster home, different than the one in which the boys were placed, due to her aggressive and hyperactive behavior. T.S. and the two boys meet regularly with the same behavior specialist. R.J.S., the youngest child, remains in a regular foster home. All four children are doing well in foster care, and the foster parents regularly take the children to meet and play as a group.

Susan Henderson is a licensed professional counselor. She began working with T.S., R.S., and T.J.S. on July 18, 2008. Henderson testified that the three children exhibited "a lot of behaviorial" and "attachment" issues based on their prior experiences with the parents that required their placement into foster care and their having to process being separated from the parents. T.S. indicated through statements and dolls there was verbal and physical abuse

- 5 -

between the parents and between the parent and the children in the home. Henderson's initial diagnosis of T.S. was "adjustment disorder with mood and conduct," which she later diagnosed as posttraumatic stress disorder (PTSD). R.S. also showed signs of PTSD. All three of the children reported that there were times when mother would forget to feed them. Initially, the three children made progress during parent visitations; however, in the late summer of 2009, the children exhibited stress and anxiety during visits that became evident in their behavior. T.S. had nightmares, withdrawal symptoms, and exhibited aggressive behavior at her foster home. The boys also had nightmares, and at school there were "conflicts with peers, oppositional behavior with teachers . . . irritability, anxiety [and] crying episodes." After LDSS changed the goal from return home to adoption in mid-January 2010, visitation stopped for four to six weeks. During that hiatus, T.S began showing a "remarkable turnaround in behavior anxiety level," and she became "cheerful, playful . . . [and] relaxed." When T.S. learned in late February 2010 that visitation would resume, "there was a traumatic change" in her. She became extremely sad and irritable and displayed aggressive behavior with the pets in the home. T.S. also showed "developmental regression in using baby talk" and "wetting herself," and she began biting her arm. T.S. became so distraught, Henderson recommend that T.S. be excused from the visitation. Although T.S. eventually resumed attending visitation, her crying, aggression, and anxiety persisted. In addition, the boys' foster parents and teachers reported that they were also "more relaxed during the time visitation stopped." After visitation resumed in late February 2010, R.S. began exhibiting "more sexualized behavior," such as "touching himself in public places." T.J.S. and T.S. "tended to show more acting out behaviors." Henderson opined that returning the children to the parents would disrupt "an ordered and healthy attachment with the current foster parents that has been existing for two and a-half years," and the biological parents would need additional "specialized parenting skills."

Dr. A. James Anderson conducted a psychological evaluation of mother on August 5, 2008. Mother "show[ed] marginal intellectual resources" and "some emotional and personality problems that are likely to interfere with her functioning in the parent role." Personality tests showed mother to be "an insecure yet overly narcissistic individual with unusually strong dependency needs." She "is excessively self-focused and preoccupied with her own needs and feelings to a degree that may prevent her from giving adequate attention to the needs and feelings of others." Dr. Anderson noted that mother appeared "well-intentioned and strongly motivated," but he said he had to emphasize to her how important it was that she actively and sincerely participate in the services she was offered and show progress with the problems that limited her parental effectiveness.

Dr. Anderson evaluated father on October 23, 2008, and reported that he scored in the border range of intelligence. Personality tests suggested father was "an overly narcissistic, egocentric, and dependent individual who tends to focus on his own needs and feelings to a degree that interferes with his ability to give adequate attention to the needs and feelings of others." Dr. Anderson opined that father "shows less ability to tolerate stress, frustration, and delay than most people," and "[he] is oriented mainly toward immediate payoffs and short-term goals rather than longer-range objectives." Father's tendency for "pleasure and stimulation over achievement-oriented activities" often leads him "to act impulsively without sufficient exercise of judgment."

Rice, a licensed counselor, began counseling mother on February 11, 2009. Rice testified that she "had grave concern[s]" that mother would be able to demonstrate an ability to meet the needs of herself and the children. According to Rice, mother had a "huge narcissistic internal focus on her needs" limiting her ability to take care of the children, and she was "very dependant" on the father to perform parental functions, especially disciplining the two boys.

Rice was also concerned with mother's inability to provide financial support for herself or the children. Rice observed several parent visitation sessions and noticed that mother spent a lot of time sending text messages on her cell phone. Although mother had some positive interactions with the children, she would often "become quite emotional" with them or "display a very harsh tone in her discipline." The children became upset when mother became upset or told the children about her personal problems. Although mother has made progress in her depression and anger, she still struggles with those issues. Moreover, Rice recalled how mother denied responsibility at first and was not fully committed, motivated, and concerned during the early stage of the case, thus delaying improvement and progress. Because mother was not able to fully understand or acknowledge her role in the children being removed, Rice did not think mother could adequately and safely care for the children. When asked how much additional counseling mother required, Rice opined "a year minimal and the concern is how engaged and how committed to the process [mother] would be." As to mother's "personality disturbances," Rice stated "it is likely counseling will never remedy that."

Vincent Jones provided mental health counseling to father and worked with him regarding his role as a parent. Jones explained that father interacted well with the children and cared for them, however, he had several personality difficulties, including narcissistic tendencies in trying to help too many people and grief and depression issues because of the death of his parents, the illness of his grandmother, and the loss of the children. Jones reminded father of his many responsibilities and repeatedly advised him he needed to curb his use of marijuana. Jones was not concerned with father's efforts; rather his "concern[s were] the marijuana smoking and the personality difficulties and loss issues." Based on father's personality issues, Jones felt it would be "a significant challenge" for father to try to parent his four children and his girlfriend's three children and deal with the two mothers and maintain full-time employment. Because of the

other issues father was dealing with, Jones felt father's initial "focus was making sure the mother had the children."

The trial court found by clear and convincing evidence that neither parent had exhibited the kind of stability needed to safely rear the children, termination was in the best interests of the children, and the parents have been unable within a reasonable period of time to remedy the conditions that brought them into foster care. The parents appeal those determinations.

ANALYSIS

Code § 16.1-283(C)(2) provides that residual parental rights may be terminated if it is in the best interests of the child and

> [t]he parent or parents, without good cause, have been unwilling or unable within a reasonable period of time not to exceed twelve months from the date the child was placed in foster care to remedy substantially the conditions which led to or required continuation of the child's foster care placement notwithstanding the reasonable and appropriate efforts of social, medical, mental health or other rehabilitative agencies to such end.

When reviewing a decision to terminate parental rights, we presume the circuit court "'thoroughly weighed all the evidence, considered the statutory requirements, and made its determination based on the child's best interests.'" Toms v. Hanover Dep't of Soc. Servs., 46 Va. App. 257, 265-66, 616 S.E.2d 765, 769 (2005) (quoting Fields v. Dinwiddie Cnty. Dep't of Soc. Servs., 46 Va. App. 1, 7, 614 S.E.2d 656, 659 (2005)). "The trial court's judgment, 'when based on evidence heard *ore tenus*, will not be disturbed on appeal unless plainly wrong or without evidence to support it.'" Id. at 266, 616 S.E.2d at 769 (quoting Logan, 13 Va. App. at 128, 409 S.E.2d at 463). "In its capacity as factfinder, therefore, the circuit court retains 'broad discretion in making the decisions necessary to guard and to foster a child's best interests.'" Id. (quoting Farley v. Farley, 9 Va. App. 326, 328, 387 S.E.2d 794, 795 (1990)).

In determining what is in the best interests of a child, this Court has stated:

> [A] court must evaluate and consider many factors, including the age and physical and mental condition of the child or children; the age and physical and mental condition of the parents; the relationship existing between each parent and each child; the needs of the child or children; the role which each parent has played, and will play in the future, in the upbringing and care of the child or children; and such other factors as are necessary in determining the best interests of the child or children.

Barkey v. Commonwealth, 2 Va. App. 662, 668, 347 S.E.2d 188, 191 (1986).

The children were placed in foster care in May 2008, following several incidents of improper supervision, and they remained in foster care for over two years. At the time of removal, mother and father, who are not married, had separated, and mother had custody of the four young children. Mother and the children lived in unsanitary conditions, mother did not have steady employment, and she was unable to provide necessary care and supervision. Father had moved in with a girlfriend who had one child from another relationship, one child with father, and another child on the way. Psychological tests showed that both parents had significant personality disorders, however, when LDSS initially offered services, the parents did not become fully engaged in the process. Neither parent was able to obtain stable, long-term employment or stable, consistent housing, and father continued to abuse marijuana despite repeated warnings of the negative ramifications from such activity. Three of the four children had significant psychological problems requiring ongoing counseling. Evidence established that the children were thriving in foster care, and the foster care families want to adopt them. Further evidence indicated the children underwent a great amount of anxiety and stress during the lengthy period they were in foster care awaiting some finality. Testimony from the experts working with the parents indicated that neither parent was capable at the time of the October 2010 hearing to properly care for the children, and at least another year of counseling and hard work was required before either parent may be able to safely care for the children.

- 10 -

We recognize that "'[t]he termination of [residual] parental rights is a grave, drastic and irreversible action.'" Helen W. v. Fairfax Cnty. Dep't of Human Dev., 12 Va. App. 877, 883, 407 S.E.2d 25, 28-29 (1991) (quoting Lowe v. Dep't of Pub. Welfare of Richmond, 231 Va. 277, 280, 343 S.E.2d 70, 72 (1986)).  However, "[i]t is clearly not in the best interests of a child to spend a lengthy period of time waiting to find out when, or even if, a parent will be capable of resuming his responsibilities." Kaywood v. Halifax Cnty. Dep't of Soc. Servs., 10 Va. App. 535, 540, 394 S.E.2d 492, 495 (1990).

Both parents testified to their love for their children, and took steps, including attending counseling, to become better parents.  The record, however, fully supports the trial court's finding that clear and convincing evidence proved the best interests of R.S., T.J.S., T.S., and R.J.S. would be served by terminating the parental rights of each parent pursuant to Code § 16.1-283(C)(2) and that the parents have been unable within a reasonable period of time to remedy substantially the conditions which led to the placement of the children in foster care. Accordingly, we summarily affirm the decisions of the trial court.  Rule 5A:27.

Affirmed.