COURT OF APPEALS OF VIRGINIA


Present:   Judges Frank, Alston and Senior Judge Coleman


SHANNON GORE, SOMETIMES KNOWN AS
  SHANNON NICOLE GORE

                                                          MEMORANDUM OPINION*
v.        Record No. 2363-11-1                                PER CURIAM
                                                              MAY 22, 2012
GLOUCESTER COUNTY DEPARTMENT
  OF SOCIAL SERVICES


                  FROM THE CIRCUIT COURT OF GLOUCESTER COUNTY
                          William H. Shaw, III, Judge Designate

                  (Charles E. Haden, on brief), for appellant.

                  (Andrea G. Erard; Brian W. Decker, Guardian *ad litem* for the
                  minor children; Dusewicz, Soberick & Decker, on brief), for
                  appellee.


        Shannon Gore (mother) appeals a trial court order terminating her parental rights to her

two minor children G.F. (dob 11/4/04) and G.M. (dob 3/23/11).  Mother contends the Gloucester

County Department of Social Services (GDSS) "failed to demonstrate by clear and convincing

evidence that [termination] was in the best interests of the children," therefore, the trial court

erred in finding the evidence sufficient and terminating her parental rights.  Upon reviewing the

record and briefs of the parties, we conclude that this appeal is without merit.  Accordingly, we

summarily affirm the decision of the trial court.  See Rule 5A:27.

        * Pursuant to Code § 17.1-413, this opinion is not designated for publication.

BACKGROUND

We view the evidence in the light most favorable to the prevailing party below and grant to it all reasonable inferences fairly deducible therefrom. See Logan v. Fairfax Cnty. Dep't of Human Dev., 13 Va. App. 123, 128, 409 S.E.2d 460, 462 (1991).

While executing a search warrant of mother's home on April 28, 2011, in connection with an unrelated burglary, police found "a naked, emaciated [six-and-one-half-year-old] female child [G.F.] covered in feces . . . caged inside a crib."[1] The "crib was covered by a wooden cover which had boxes stacked on top of it" preventing G.F. from getting out. The legs of the crib had been removed, and there was no mattress inside. G.F. "was unable to extend her legs" and sat "in a contracted position with her knees [against] her chest."[2] G.F. had red spots on her bottom caused by her heels being forced under her body. The crib contained feces "one to two inches deep" in places and "sippy cups" with the remains of soured milk, several empty black food trays from prepared frozen dinners, and a few toys, which were "filthy."

G.F. was extremely thin, her skeletal bones were prominently visible, and her hair was matted, brittle, and falling out in clumps. G.F.'s body was covered in feces, her skin appeared to be peeling, she had an excessive amount of ear wax outside of her ears, and her fingernails and toenails were extremely long and contained feces.

Police arrested mother and her husband, Brian Gore (father), and GDSS immediately removed the children. The parents were unable to identify an appropriate caretaker for the children.

---

[1] No transcript of the trial court proceeding was filed in this case. Rather, the facts are reflected in the exhibits and orders in the record and the agreed written statement of facts, testimony and other incidents of the case signed by all parties and approved by the trial court on January 9, 2012.

[2] These initial observations were made by Lieutenant Little and Lisa Kersey, a Child Protective Services supervisor with GDSS.

GDSS social worker Melissa Thompson testified that the maternal grandparents, Karen and John Smith, were unable to take custody of either child because of Karen's health conditions. Mother told CPS supervisor Kersey that her mother, Karen, "was not a viable placement option due to her mother's" diabetes, high blood pressure, and anxiety issues relating to a recent tornado of which she and her husband were victims. Thus, although the Smiths expressed a desire to care for the children, they were "ambivalent regarding their ability and whether or not this is in the best interest of the children." When the social worker met with the Smiths on June 16, 2011, to assess their suitability to care for the children, the Smiths merely provided information regarding placement with other relatives. In addition, the guardian *ad litem* reported that John Smith "refused to complete a home study," resulting in the guardian's recommendation that the maternal grandparents were not "a viable placement resource and that no home study should be necessary." Although there were other relatives located out of state, none of them were willing or able to assume custody.

G.F. was born at home and did not have a birth certificate or medical records reflecting she had ever been seen or treated by a doctor. Mother told Kersey that G.F. was "good" until she was one year old, at which time she changed. Mother said she kept G.F. in a cage because of G.F.'s "developmental issues," however, no medical records supported mother's claims.

According to the father, the parents had been leaving G.F. alone in the house since her birth, and they regularly left G.F. in the crib while they went to work. The father could not recall the last time G.F. was bathed. Although it "is unclear from the parents' history how often G.F. was fed," they "told investigators that towards the end, she was rarely fed."

Authorities learned from the father that the parents had a male son (G.M.1[3]) born at home on August 23, 2007. As with G.F., the parents did not tell anyone about the child's birth or existence. G.M.1 died in the home while very young. The father recalled how G.M.1 had trouble breathing, but he was uncomfortable giving the child CPR, and he did not want to call 911 because he was afraid paramedics would find G.F. Father went to work, and when he returned that evening, G.M.1 was in mother's arms, dead. The parents buried G.M.1 in their backyard.[4]

Mother works as a restaurant manager, and father "works with air conditioners." Other than the room where G.F. was caged, the parents' home was described as "impeccably clean." A son (G.M.) was born in a hospital on March 23, 2011. Other than being slightly dehydrated, he appeared healthy and "had his own fully decorated, clean room in the home." During an inspection of the home, investigators reported the family had "a well-cared-for dog as well as fresh cut flowers in a vase."

Dr. Verena Wyvill, a child abuse pediatric specialist at Children's Hospital of the King's Daughters (CHKD) examined G.F. and reported that G.F., then six and one-half years old, weighed just under sixteen pounds, which was in the "50th percentile for a 6 month old infant." Her height was just over thirty-six inches, which placed her in the "50th percentile for a 33 month girl, and her head circumference" of just over nineteen inches "was "50th percentile for a 36 month old girl." G.F. was more than twenty-three pounds underweight and almost eight

---

[3] The parents named their subsequent son the same name as the son who died in their care, therefore, the first son is referred to as G.M.1 and the son who is the subject of the termination is referred to as G.M.

[4] Mother said G.M.1 was seven months old when he died, whereas father said he was two weeks old.

inches shorter than she should have been for her age.[5] Because G.F.'s head circumference, which is "related to brain growth," was "that of a 3 year old," Dr. Wyvill "estimate[d] that [her] nutritional neglect started most likely before she was 3 years of age." Dr. Wyvill opined that "[w]hen a child is malnourished such that the brain is not growing, severe developmental deficits take place that will never be overcome." Regarding G.F., whose "head growth stalled at 3 years of age," the doctor opined "that her nutritional neglect is longstanding and severe."

According to Dr. Wyvill, G.F. exhibited symptoms of "cachexia, [which is] physical wasting with loss of weight and muscle mass," and she "had no apparent speech." Her ribs, shoulder blades, spine, pelvic bones, and sacrum protruded prominently. G.F. exhibited "contractures" which are "abnormal shortening of muscle tissue of her legs," which she could not extend. G.F.'s skin was dry and flaking as was her scalp. Despite her physical condition, G.F. appeared alert and interactive.

"There are no medical records showing that G.F. ever received immunizations or regular well-child check-ups," Dr. Wyvill reported, and she was never enrolled in school, reflecting medical and educational neglect. Dr. Wyvill further reported that "the condition in which [G.F.] was found was deplorable and incompatible with any form of normal parenting." In addition, leaving G.F. alone subjected her to a "risk of death from natural disasters such as a house fire," and "imprisoning" her in the crib "constitute[d] physical abuse as does intentional starvation." Moreover, the extreme isolation in which G.F. was kept constituted "emotional abuse."

> G.F.'s diagnoses include[d] the following: severe malnutrition, secondary to neglect, severe generalized osteopenia, refeeding syndrome, suspected gastric bezoar, microencephaly (abnormally small head), anemia, rickets, developmental delays, social isolation, [and] neglect.

---

[5] These projected calculations assumed G.F. "was born at the 10th percentile."

Dr. Wyvill concluded her report with the following:

> The combination of *imprisonment, starvation, lack of access to basic human necessities such as clothing and toilet, and extreme medical neglect constitutes torture of a child.* Although [G.F.] is thriving in the hospital setting, the devastating effects of prolonged starvation and emotional abuse on her development remain to be seen. [G.F.] will need intensive medical and psychological intervention for years to come and her ultimate outcome will not be apparent for many years.

(Emphasis added.)

Medical staff at CHKD indicated "that it was likely that [G.F.] would not have survived more than a week longer in the condition she was found." Medical personnel worked to have G.F. "walking before [her] discharge" from the hospital. While there, G.F. was able to "move herself 2-3 feet distances in a duck-like manner, with her legs still constricted against her chest." Moreover, since her removal, G.F. has begun improving her ability to speak. Her "knowledge base is equivalent to an 18-24 month old child."

G.M. was thirty-five days old at the time of removal and was slightly dehydrated. Although G.M. had received routine medical care, mother received no prenatal care during her pregnancy with him. Based on the severe abuse of G.F., G.M.'s sister, G.M. was "assessed to be high risk of abuse & neglect if left in the care of his parents." The foster care service plan identified several needs for G.M., including a permanent, stable, and structured home environment with adequate food, clothing, and supervision, and regular medical care.

Mother never challenged the goal of adoption set forth in the foster care plan, therefore, the only issue before the trial court was the decision to terminate her parental rights.

Before ruling, the trial court "inquired about the [possibility] of relatives as possible placements for the children." Counsel for GDSS summarized the agency's extensive efforts to locate and place the children with relatives and reiterated that none of the relatives was a viable placement option.

- 6 -

After considering all of the evidence, the trial court found that GDSS proved by clear and convincing evidence that termination of mother's parental rights was in the best interests of the children. In making its decision, the trial court noted there were no relatives willing and able to assume custody of the children and provide for their needs. As a result, the trial court terminated mother's residual parental rights to G.F. pursuant to Code § 16.1-283(E)(iv), and her residual parental rights to G.M. pursuant to Code § 16.1-283(E)(i).

DISCUSSION

"Code § 16.1-283 embodies 'the statutory scheme for the . . . termination of residual parental rights in this Commonwealth' . . . [which] 'provides detailed procedures designed to protect the rights of the parents and their child,' balancing their interests while seeking to preserve the family." Lecky v. Reed, 20 Va. App. 306, 311, 456 S.E.2d 538, 540 (1995) (quoting Rader v. Montgomery Cnty. Dep't of Social Servs., 5 Va. App. 523, 526, 365 S.E.2d 234, 235 (1988)). In all cases brought under Code § 16.1-283, the court must find, by clear and convincing evidence, that the termination of residual parental rights is in the best interests of the child. Furthermore, the various subsections of Code § 16.1-283 provide distinct, "individual bases upon which a petitioner may seek to terminate residual parental rights." City of Newport News v. Winslow, 40 Va. App. 556, 563, 580 S.E.2d 463, 466 (2003).

In determining what is in the best interests of a child, this Court has stated:

> [A] court must evaluate and consider many factors, including the age and physical and mental condition of the child or children; the age and physical and mental condition of the parents; the relationship existing between each parent and each child; the needs of the child or children; the role which each parent has played, and will play in the future, in the upbringing and care of the child or children; and such other factors as are necessary in determining the best interests of the child or children.

Barkey v. Commonwealth, 2 Va. App. 662, 668, 347 S.E.2d 188, 191 (1986).

In evaluating the sufficiency of the evidence to support a termination, we presume the trial court "'thoroughly weighed all the evidence, considered the statutory requirements, and made its determination based on the child's best interests.'" Fields v. Dinwiddie Cnty. Dep't of Soc. Servs., 46 Va. App. 1, 7, 614 S.E.2d 656, 659 (2005) (quoting Farley v. Farley, 9 Va. App. 326, 329, 387 S.E.2d 794, 796 (1990)). "The trial court's judgment, 'when based on evidence heard *ore tenus*, will not be disturbed on appeal unless plainly wrong or without evidence to support it.'" Id. (quoting Logan, 13 Va. App. at 128, 409 S.E.2d at 463). In its capacity as fact finder, therefore, the circuit court retains "broad discretion in making the decisions necessary to guard and to foster a child's best interests." Farley, 9 Va. App. at 328, 387 S.E.2d at 795.

Mother does not challenge the trial court's finding of "aggravated circumstances" under Code § 16.1-283(E)(iv) regarding G.F., and the finding under Code § 16.1-283(E)(i) regarding G.M. Instead, mother's sole argument is that "the evidence [fell] short of the standard of clear and convincing proof that termination . . . was in the best interest of the children where termination had the effect of preventing the maternal grandparents from exercising a positive and healthy role in the lives of the grandchildren." Mother also "disputes" the evidence in the record regarding the grandparents' desire and ability to care for the children.

Contrary to mother's assertions, the record contains extensive evidence that GDSS scrupulously attempted to locate suitable relatives to assume custody of the children, but they were unable to find anyone capable or willing to assume custody of the children. Although mother claims "it was in the best interest of the children to place [them] with the maternal grandparents rather than place [them] for adoption," the record shows the maternal grandparents were unwilling to or incapable of assuming custody. In fact, mother initially told GDSS that her mother was not "a viable placement option" because of her health. As to mother's assertion that it was in the children's best interests to allow visitation with the grandparents rather than

- 8 -

terminate mother's parental rights, visitation has nothing to do with finding a relative to take custody of a child, nor with the decision to terminate mother's residual parental rights, and mother submitted no legal authority to support that statement. Moreover, because mother kept G.F.'s identity a secret from the maternal grandparents and because G.M. was only one month old at the time he was placed in foster care, the children and maternal grandparents had no relationship.

Mother kept two of her three children a secret from everyone. She allowed one son to die in her home because she did not seek medical treatment for fear authorities would discover she was torturing G.F. Regarding G.F., mother failed to provide her food, emotional stimulation, medical care, or schooling. G.M. was just over one month old when authorities discovered him. The evidence showed that mother began abusing and torturing G.F. when she was between one and three years old. Based on the amount of abuse and torture inflicted on G.F. by mother, it was clearly not in G.M.'s best interests to allow mother to maintain her parental rights as to him, lest he face the same abuse and torture mother inflicted on G.F. and/or die from lack of medical care as happened to G.M.'s namesake and deceased sibling, G.M.1.

Based on the quantum of evidence regarding mother's treatment of her children and GDSS's numerous attempts and inability to locate suitable relatives willing and able to assume custody, we cannot say the trial court erred in finding that GDSS presented clear and convincing evidence satisfying the statutory requirements of Code § 16.1-283(E) and proving that it was in the best interests of the children to terminate mother's parental rights. Accordingly, the decision of the trial court is summarily affirmed. See Rule 5A:27.

Affirmed.