COURT OF APPEALS OF VIRGINIA

Present:   Judges Kelsey, Petty and Senior Judge Bumgardner

SIMONE SCOTT

v.      Record No. 2214-11-3

ROANOKE CITY DEPARTMENT OF SOCIAL SERVICES


SIMONE SCOTT

v.      Record No. 2215-11-3

ROANOKE CITY DEPARTMENT OF SOCIAL SERVICES


SIMONE SCOTT

 

v.      Record No. 2216-11-3

ROANOKE CITY DEPARTMENT OF SOCIAL SERVICES

MEMORANDUM OPINION[*]
PER CURIAM
APRIL 3, 2012


SIMONE SCOTT

v.      Record No. 2217-11-3

ROANOKE CITY DEPARTMENT OF SOCIAL SERVICES


SIMONE SCOTT

v.      Record No. 2218-11-3

ROANOKE CITY DEPARTMENT OF SOCIAL SERVICES


SIMONE SCOTT

v.      Record No. 2219-11-3

ROANOKE CITY DEPARTMENT OF SOCIAL SERVICES

---

[*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

FROM THE CIRCUIT COURT OF THE CITY OF ROANOKE
Clifford R. Weckstein, Judge

(Charles J. Covati, on briefs), for appellant.  Appellant submitting
on briefs.

(Timothy R. Spencer, Acting City Attorney; Heather P. Ferguson,
Assistant City Attorney; Rena G. Berry, Guardian *ad litem* for the
minor children, on briefs), for appellee.  Appellee and Guardian
*ad litem* submitting on briefs.

Simone Scott (mother) appeals the trial court's orders terminating her parental rights to six of her children.

In Record Nos. 2214-11-3, 2215-11-3, 2217-11-3, 2218-11-3, and 2219-11-3, mother contends the trial court erred in "finding that the evidence was sufficient to terminate the parental rights of Scott and approve the Department's permanency planning goal of adoption" for five of her minor children:  E.S-J., Q.S-J., A.S., M.S., and N.H.

In Record No. 2216-11-3, mother contends the trial court erred in finding sufficient evidence to terminate her parental rights to F.S.  In addition, mother also alleges the trial court erred in "attempt[ing] to explain the adoption process to [F.S.] in order to ascertain if he consented to the termination of his mother's parental rights."

For the reasons stated below, we affirm the decision of the trial court.

## BACKGROUND

On appeal, we view the evidence in the "'light most favorable' to the prevailing party in the circuit court and grant to that party the benefit of 'all reasonable inferences fairly deducible therefrom.'" Toms v. Hanover Dep't of Soc. Servs., 46 Va. App. 257, 262, 616 S.E.2d 765, 767 (2005) (quoting Logan v. Fairfax County Dep't of Human Dev., 13 Va. App. 123, 128, 409 S.E.2d 460, 463 (1991)).

Roanoke City Department of Social Services (DSS or the Department) became involved with mother in April 2009, after she gave birth, prematurely, to twins, S.S-J and T.S-J. One twin was born at home, and the other was born later at the hospital "after prolonged oxygen deprivation." Mother claimed she was unaware she was having twins because she did not receive any prenatal care. The twins had serious medical conditions that needed special attention, but the parents declined the hospital's requests to teach them how to medically care for the underweight, premature twins. As a result, a Child Protective Services (CPS) complaint was lodged and DSS provided services to the family. T.S-J. was hospitalized, and S.S-J. was removed from the home on June 15, 2009. T.S-J. died on June 19, 2009. At mother's August 10, 2011 hearing, the trial court admitted an order dated January 10, 2011 reflecting that mother's residual parental rights to S.S-J. were previously terminated in an unrelated proceeding.

In early May 2009, CPS received a complaint regarding then thirteen-month old E.S-J. who was visiting her pediatrician for the first time since she was born to get past due immunizations. The doctor diagnosed E.S-J. with, among other things, "failure to thrive" and suspected that she and several of her siblings may suffer from fetal alcohol syndrome. At the time, mother had nine children, eight of whom lived with her.[1]

On July 13, 2009, CPS Investigator Julie Allie filed petitions for preliminary protective orders to remove the remaining children. In an affidavit, she alleged that they "are being physically, medically and educationally neglected by their parents," who "have shown minimal

---

[1] In addition to the six named children in these appeals and the twins born in 2009, mother gave birth to M.S. on October 12, 2001. Custody of M.S. was previously awarded to M.S.'s biological father in an unrelated proceeding following the child's removal in New Jersey.
Eight of the nine children were fathered by five men named in December 2010 petitions to terminate each man's parental rights in addition to those of mother.
Evidence at the August 2011 hearing showed that mother was pregnant with her tenth child in April 2011 when she entered the Project Link Program, a case management, non-treatment program for women who have small children under three, who are pregnant, and who use or are at risk of using drugs.

supervision and concern for the health and welfare of their children." Allie related that mother's

blood alcohol level was twice the legal limit during a visit with the remaining living twin, S.S-J.,

on June 17, 2009, thereby preventing mother from visiting with the child. The parents signed a

safety plan on May 7, 2009, agreeing to cooperate with the hospital, all of the children's

pediatricians, DSS, CHIP, and CAPTA, and not miss any further medical appointments for the

children. However, Allie reported that mother "has not made herself available to the

pediatricians, CAPTA, CHIP, [or] Dominion Day Services regarding the care of any of her

children." In order to correct the situation, Allie had recommended that mother and father

receive substance abuse assessments, cooperate with psychological evaluations, cooperate with

all service providers and agencies assigned to assist them with the children, have the children see

a doctor at least once a year, and keep all medical appointments for the children. Allie

documented the following regarding services offered to the parents:

> The family currently receives TANF, Food Stamps and Medicaid,
> Section 8 to pay all of their rent, Access to pay all utilities, [and]
> SSI for [S.S-J]. Child Protective Services instituted a Safety Plan
> with appropriate provisions for the children's care; however,
> Ms. Scott has not been cooperative with DSS, the children's
> pediatricians, CHIP, CAPTA or the Dominion Day Services for
> her children. Due to Ms. Scott's egregious lack of cooperation
> with the Department of Social Services, no additional services can
> be offered at this time without court order.

On August 10, 2009, DSS received another complaint about mother. The caller alleged

mother was selling her food stamps, the house was filthy, and the children were wearing dirty

clothes to school. When Allie visited the house to investigate, mother was gone, leaving

twelve-year-old F.S. in charge of three of his younger siblings. F.S. did not know where his

mother was or when she would return, nor was he able to contact her. Allie confirmed the filthy

condition of the home, including spoiled food, roach infestation, trash and debris strewn about, a

non-functioning smoke detector, and a mattress and dirty diapers on the floor. As a result, DSS removed the children pursuant to an emergency protective order.

Heather Woods is the foster care case worker for the children that were removed on August 10, 2009. She testified that the initial foster care plan indicated a goal of return home and listed the services offered to mother and father and several things the parents were required to do, including completing all court-ordered assessments, evaluations, and classes, complying with all recommended treatment, obtaining regular employment, keeping the home clean and safe, maintaining sobriety, attending visitation, and demonstrating improved parenting skills. DSS "also recommended that [mother] seek individual counseling, a [psychiatric] evaluation for medication management and that she attend an evaluation with the Department of Rehabilitat[ion] Services and again that she go to Substance Abuse Treatment."

Licensed clinical psychologist[2] Dr. Michael Chiglinsky met with mother on August 3, August 19, and September 4, 2009 to assess her psychological condition "and parental capacity." Although mother denied substance abuse, Dr. Chiglinsky detected a slight odor of alcohol on mother. Dr. Chiglinsky testified that mother had difficulty focusing her attention or concentrating for an extended period of time, and she fell asleep on one occasion while working independently in the evaluation process. Mother exhibited considerable psychological disturbance, notably, the presence of "a mood disorder," namely, a "major depressive syndrome which is a severe depression that is [ongoing and] recurrent." There were also indications of bi-polarity, as well as depression, and manic "frenetic activity, [that was] not very focused." Moreover, mother demonstrated a great deal of "mental confusion" that prevented her from focusing on and addressing her problems. Mother also exhibited "a paranoiac personality

---

[2] Although the court reporter referred to Dr. Chiglinsky as a "clinical physiologist," the documents in the record show he is a clinical psychologist.

disorder" that prevented her from accepting any responsibility for the removal of the children and getting help. Despite mother's denials of substance abuse, her profile indicated that "alcohol abuse" may be a factor that needs to be addressed through rehabilitation. Dr. Chiglinsky opined that mother has "severe impairments" that inhibit "her capacity to effectually parent her children at this particular time," and are likely to "put [her] children at risk for harm." According to Dr. Chiglinsky, "[s]tabilization would be necessary before you would be able to then make a further determination of her capacity to parent in the future." Dr. Chiglinsky recommended that mother be further assessed and treated for a "substance related disorder" and receive vocational rehabilitation so she could obtain employment. By working, mother would boost her self-esteem and be able to better provide for her children. Dr. Chiglinsky outlined his recommendations and prognoses for mother in the following testimony:

> Given the extent [and] the severity of her depression, her mood disorder, certainly a psychiatric evaluation was warranted. The purpose of that being to assist in elevating those negative biological symptoms that could be address[ed] by medication intervention through psychiatri[c] services. There was also the recommendation for p[sycho]logical treatment . . . collaboratively with the psychiatri[c] intervention. Because we know from the clinical research that the combination of medication, intervention and p[sycho]logical treatment is the most efficacious manner of intervening with these types of disorders. The likelihood of Ms. Scott's compliance with that treatment regimen though was judged to be quite low. The probabilities of follow through would be quite low in part because of her personality disorder. The paranoia characteristics [and] also the tendency for her to be so disorganized in her thinking that follow through would not likely be a high probability type of issue.

In other words, mother requires long-term treatment for psychological and substance abuse problems, but her repeated refusals to acknowledge them or consistently obtain treatment makes it unlikely she would actively participate in or succeed at treatment. Moreover, absent such participation, her condition will worsen.

- 6 -

On December 21, 2010, more than sixteen months after the children were removed, DSS filed petitions for new foster care plans with permanent goals of adoption for the children. Caseworker Woods described the services that had been offered to mother and provided the following explanation for requesting a change from return home to adoption:

> Ms. Scott's biggest barrier to date continues to be her denial of her substance abuse problem. As recently as December 9, 2010, Ms. Scott denied having a drinking problem. [She] was referred for a Substance Abuse Assessment and follow up treatment beginning in July 2009. She denied substance usage and declined inpatient detox until December 2009. Ms. Scott completed her thirty day inpatient program and was referred to the PHASES program at Blue Ridge upon her discharge in January 2010. She did not begin the PHASES program until March 2010. She had a positive breathalyzer of .115 on March 25, 2010 when she arrived for group. She was suspended from the PHASES program in May [2010] due to excessive absences and tardies. She was allowed to return in June [2010]. She attended sporadically and was suspended again for absences in August [2010]. She was offered individual sessions and counseling during this suspension but was not allowed to return to PHASES until October [2010]. She did not attend the individual sessions as offered. On October 14th [2010] she was referred to five day a week day treatment and was informed that she could also begin psychiatric care and counseling if she requested it. She attended one group on October 27th [2010]. She was invited to return to day treatment on November 8th [2010] without a suspension for her absences. She attended for a few days and then was sent home when she attended group on November 10 [2010] and was positive for alcohol with a BAC of .156. She returned on November 12, [2010], missed the next six days and returned on November 18th [2010,] with a positive breathalyzer of .187. She was offered a bed in the detox program on that day and she declined. She was then suspended again on November 23rd [2010] for failure to attend. She is not eligible to return again until December 23rd [2010]. Her lead counselor, Joanna Jones, is recommending inpatient treatment at this time.

In her report, Woods noted that mother "has also not complied with individual counseling or medication management referrals as recommended by the psychological evaluation." Despite numerous reminders to mother that she is required to participate in such programs as part of the service plan, mother "continues to [deny substance abuse and emotional problems and] state that

these are not services that she needs." Although mother attended parenting classes, Woods stated that she "has not successfully demonstrated an ability to practice what she has learned." Moreover, mother continues to remain in an abusive relationship with the father of the three youngest children.

Melissa West is a family reunification worker with DePaul Community Resources. West first worked with mother from June 2009 until June 2010. West began working with mother again on August 30, 2010, offering her "basically the same services" mother was previously offered because mother did not follow through or complete those programs, especially a substance abuse program. Thus, DSS "went back through the assessment through Blue Ridge [Behavioral Health Care] and tried to get [mother] back started again with that [substance abuse] program."

E.S-J. was born prematurely on April 1, 2008, and was not taken to a doctor again until May 2009. As noted, the doctor diagnosed her condition as "failure to thrive," and suspected fetal alcohol syndrome and familial psychosocial problems. E.S-J. is now in a two-parent foster home in which she has thrived. She has gained weight and is beginning to meet age appropriate developmental milestones. She receives speech therapy and is increasing her vocabulary. The doctor is performing tests to determine if she meets the criteria for fetal alcohol syndrome.

Q.S. was born on August 6, 2006. During a home visit prior to his removal, the CPS worker reported that Q.S. wore dirty, ill-fitting clothes and had not eaten that day. Early medical records indicated an acute middle ear infection, abnormal blood chemistry (possibly lead related), and "Failure to Thrive in childhood." At the time of removal, he was significantly underweight and had developmental delays in his speech. Since his removal, Q.J. has done much better. The doctor is currently performing tests to determine if he suffers from fetal alcohol syndrome.

A.S. was born on August 4, 2000.  At the time of his removal, A.S. exhibited severe behavior problems, had violent outbursts, and had missed fourteen days of school.  He and his brother, M.S., receive services for severe behavior problems.  A.S. is currently in his second foster home with foster parents who are willing and better able to meet all of his special needs and where he feels safe and secure.  He is performing much better in school and is in therapy to address behavior and attachment issues.

N.H. was born on March 3, 1999.  Mother was six months late in getting her required immunizations.  She also failed to have her vision retested for uncorrected vision problems.  N.H. told DSS workers that her mother regularly drank and that she and her older brother, F.S., were often responsible for caring for the other children.  Since placement in foster care, N.H. has been attending school more regularly and excelling.

M.S. was born February 25, 1998, and at the time of removal, he had missed several medical appointments.  M.S. was absent from school nine days, and he missed an additional thirteen days while under suspension.  Like A.S., M.S also had behavior and aggression issues and is in therapy to address them.  Since being placed in foster care, M.S. has matured.  He has learned to better express his emotions and deal with conflict.  He is performing well in school.  Both M.S. and A.S. receive after-school services through Dominion Day Services.  Staff members reported that mother refused to meet with them to discuss concerns about the children, telling them she did not have time to do so and the staff should drop the children from the program.

F.S. is mother's oldest child and was born on September 26, 1996.  At the time of his removal, he had not seen his pediatrician in over two years.  According to CPS worker Woods, F.S. acts as "the father figure for all of the children" during group visits and mother treats him more as a friend than her child.  F.S. currently attends counseling and therapy sessions, and his

foster home provides for his physical, mental, emotional, and educational needs. F.S. is currently an honor roll student in the Honors Program at his school. He is healthy, safe, and comfortable in his foster home and is beginning to learn independent living skills.

Mother has not been employed since 2001, nor did she attempt to obtain employment or employment skills or complete her GED during the period the children were in foster care. Instead, she became pregnant with her tenth child.

After considering all of the evidence and argument from counsel, the trial court approved the changes of goals for all the children, finding by clear and convincing evidence that termination of mother's residual parental rights to each of the six children is in the best interests of each child, and:

> [A] [T]here is no reasonable likelihood that the conditions which resulted in such neglect or abuse [of the children] can be substantially corrected or eliminated so as to allow them to return home safely within a reasonable period of time. . . . [Code § 16.1-283(B);]
>
> [B] [Mother] has, without good cause, been unable or unwilling within a reasonable period of time not to exceed twelve months from the date each of these children were placed in foster care to remedy substantially the conditions which led to or required the continuation of the child's foster care placement, notwithstanding the reasonable and appropriate efforts of social, medical, mental health or other rehabilitative agencies to such end [Code § 16.1-283(C)(2)] . . . [; and]
>
> [C] [Mother's] residual parental rights to a sibling of these children were involuntarily terminated by order of the Circuit Court of the City of Roanoke entered on January 3, 2011 [Code § 16.1-283(E)].

## DISCUSSION

### Sufficient Evidence to Terminate

Mother first claims the trial court erred in finding the evidence sufficient to terminate her parental rights to E.S-J., Q.S-J., A.S., M.S., N.H, and F.S. She claims at the time of the December

2011 hearing, she "had completed all but a couple requirements," in that she had completed a psychological examination, domestic violence classes, parenting classes, and a thirty-day inpatient substance abuse program, as well as visiting the children and attending the Phases Program.

"When addressing matters concerning a child, including the termination of a parent's residual parental rights, the paramount consideration of a trial court is the child's best interests." Logan, 13 Va. App. at 128, 409 S.E.2d at 463. Where the trial judge hears the evidence *ore tenus,* his decision is entitled to great weight and will not be disturbed on appeal unless plainly wrong or without evidence to support it. See Lowe v. Dep't of Pub. Welfare, 231 Va. 277, 282, 343 S.E.2d 70, 73 (1986).

The children entered foster care in August 2009, following complaints of abuse, neglect, and lack of supervision. At the time of removal, the children suffered various levels of neglect and abuse. They had missed pediatric appointments and required immunizations, and suffered from poor nutrition and lack of adequate supervision. Many of the children have special needs which mother is incapable of handling due to her own deficiencies, which she has been unable or unwilling to acknowledge, address, or overcome.

According to Dr. Chiglinsky, mother would require a prolonged course of treatment in order to stabilize her mood disorder and other psychological problems so as to be able to safely parent the children, and he opined her chance of success was low. Moreover, mother's condition could worsen without treatment, further jeopardizing the health and safety of the children.

DSS provided numerous services to the children and to mother, and it encouraged mother to address her substance abuse and psychological/psychiatric problems. However, mother has continually and repeatedly denied having psychological or substance abuse problems, resulting in a failure to effectively and timely participate in a treatment program and making it impossible for her to overcome those deficiencies. The record is devoid of any documentation that mother

successfully completed a substance abuse program during the twenty-four-month period between the children's removal and trial, or that mother is participating in a program to address her mood disorders, depression, and paranoia.

Mother argues she participated in and completed most of the mandated requirements, thus the evidence did not satisfy termination under Code § 16.1-283(B) and (C)(2). However, mother does not challenge the finding under Code § 16.1-283(E), which allows termination upon clear and convincing evidence that it is in the children's best interests and that mother's residual parental rights to a sibling of the children were previously involuntarily terminated.

All three statutory provisions require a showing that termination is in the children's best interests. In determining what is in the best interests of a child, this Court has stated:

> a court must evaluate and consider many factors, including the age and physical and mental condition of the child or children; the age and physical and mental condition of the parents; the relationship existing between each parent and each child; the needs of the child or children; the role which each parent has played, and will play in the future, in the upbringing and care of the child or children; and such other factors as are necessary in determining the best interests of the child or children.

Barkey v. Commonwealth, 2 Va. App. 662, 668, 347 S.E.2d 188, 191 (1986).

The evidence showed the children were neglected, abused, and improperly supervised prior to removal, they have thrived since being placed in foster care and receiving DSS services, and mother continues to abuse alcohol and have psychological problems that negatively affect the children which she has failed to acknowledge or correct. Based on the children's condition and care before and after removal, and mother's inability to correct the problems causing the abuse and neglect, clear and convincing evidence supported the trial court's decision that termination was in the children's best interests. Clear and convincing evidence also established that mother's residual parental rights to the children's sibling, S.S-J., were previously terminated.

Accordingly, the record supports the trial court's decision to terminate under Code § 16.1-283(E).

To the extent mother contends the trial court erred in terminating her residual parental rights pursuant to Code § 16.1-283(B) and (C)(2), we need not reach this issue because we conclude that the trial court's decision terminating mother's parental rights was warranted under Code § 16.1-283(E).

<u>F.S.'s Consent to Adoption</u>

In Record No. 2216-11-3, mother presented the following additional assignment of error:

> Error lies in the Trial Court's attempts to explain the adoption process to [F.S.] in order to ascertain if he consented to the termination of his mother's paternal [sic] rights.

At the beginning of her one-page, two-paragraph argument, mother included the following heading:

> THE TRIAL COURT'S EXPLANATION OF THE ADOPTION PREOCESS TO THE MINOR CHILD WAS INCORRECT AND HIS CONSENT WAS NOT WILLINGLY GIVEN THUS THE COURT WAS WITHOUT GROUNDS TO TERMINATE THE PARENTAL RIGHTS OF SCOTT AND APPROVE THE DEPARTMENT'S PERMANENCY PLANNING GOAL OF ADOPTION FOR [F.S.].

Pursuant to Code § 16.1-283(G), "residual parental rights shall not be terminated if it is established that the child, if he is fourteen years of age or older . . . , objects to such termination." F.S. was fourteen years old at the time of the August 10, 2011 hearing in the trial court, therefore, the parties and the trial court solicited whether or not he objected to termination of his mother's residual parental rights.

Mother argues "[t]he evidence was insufficient as a matter of law to sustain a finding that [F.S.] consented to the termination of the parental rights of his mother."

Mother's attorney questioned F.S. and asked him, "One thing we have to find out is if you object to termination of your mother's parental rights, do you object?" F.S. answered, "Yes." During further questioning, the record demonstrates that F.S. appeared confused and did not understand what termination of his mother's residual parental rights entailed or meant, so the parties, guardian *ad litem*, and trial judge provided several explanations. During those explanations, F.S.'s guardian *ad litem* asked F.S. "what is it you want to happen," and F.S. replied, "I am interested in adoption."

The trial judge explained that terminating his mother's residual parental rights meant "cut[ting] off [his] legal relationship" with his mother such that she would "no longer ha[ve] a legal relationship with [him]," and allow DSS to place him for adoption. F.S. was reluctant to answer and indicated he felt pressured, so the parties suggested that everyone leave the courtroom except counsel and the trial judge to relieve the pressure on F.S.

There was further discussion as to what termination entailed, the effect of being placed for adoption if he objects to termination, and whether he would continue to have telephone contact with his mother. Mother objected to DSS's counsel's statement that "the contact will remain the same," arguing that decision "is completely at the discretion of the foster parent at that point." The trial judge noted there was no reason to expect contact would be cut off, but redirected the issue and explained to F.S., "What we are talking about here" is whether you object to termination, and if you do, "that means there will be no placement for adoption."

After repeated discussions and explanations, the following took place:

> THE COURT: We are again in session. [Counsel for the parties and the guardian *ad litem* are present]. Everybody else who is not here is [outside] to try to keep there from being any more pressure on you that is just because of the fact that you are being asked to make a statement that could have a lot to do with [your] future one way or the other. [F.S.] are you ready to say whether you object or do not object?

A. [F.S.] Yes.

Q. Do you object to having your mother's residual parental rights terminate?

A. [F.S.] And basically what is that saying?

Q. That is saying if you do not object then if her rights are terminated you could be placed for adoption.

A. [F.S.] Okay.

Q. If you do object her rights will not be terminated and you cannot be placed for adoption by the Department of Social Services. So I can ask it, do you object to having the court enter an order that will by terminating your mother's rights leave the possibility of future placement for adoption.

A. [F.S.] I do not object.

Q. All right. Does anyone want to ask any other questions or are we - -

MR. COVATI [for mother]: No, sir.

MS. FERGUSON [for DSS]: No, Sir,

MS. BERRY [guardian *ad litem*]: No, sir.

In her sufficiency argument, mother claims that DSS misinformed F.S. about continued phone contact with his mother, and the trial court's explanation that there would be no possibility F.S. could be placed for adoption if he objects to termination "further muddied the waters and led to [F.S.] making a misinformed decision."

After F.S. finally answered and voiced no objection to termination, mother did not object to the trial judge's question nor question F.S. further to determine if his refusal to object was based upon a misunderstanding. Although mother earlier objected when the trial judge stated that if F.S. objects to termination he cannot be placed for adoption by DSS, her objection at that time was without merit because she argued and ostensibly wanted to tell F.S that he could change his mind and later object, and he could be placed for adoption "if the Department meets

- 15 -

[all the requirements in the present hearing] except his consent." The trial judge correctly rejected that argument.

Although the lengthy colloquy between the court, counsel, and F.S. resulted in much confusion and incomplete explanations as to the effects of F.S.'s decision to object or not, he was eventually asked, pursuant to the statute, whether he objected to termination, and he was correctly told that if he did object, his mother's rights would not be terminated and he could not be placed for adoption. Those are accurate statements of the law. The trial judge carefully questioned F.S. and was able to judge his understanding of the issue before him. "The credibility of the witnesses and the weight accorded the evidence are matters solely for the fact finder who has the opportunity to see and hear that evidence as it is presented." Sandoval v. Commonwealth, 20 Va. App. 133, 138, 455 S.E.2d 730, 732 (1995). Viewing the totality of the questions and explanations, and F.S.'s ultimate response to the straight-forward question finally posed to him, we cannot say the trial judge erred in finding sufficient evidence that F.S. did not object to termination.

Accordingly, the decision of the trial court is affirmed.

Affirmed.