COURT OF APPEALS OF VIRGINIA

Present: Chief Judge Felton, Judges Frank and Huff
Argued at Alexandria, Virginia

UNPUBLISHED

KATHLEEN MARY FABIAN-CERDA, A/K/A
 KATHLEEN MARY FABIAN, A/K/A
 KATHLEEN MARY FABIAN CERDA

                                                    MEMORANDUM OPINION[*] BY
v.        Record No. 2055-13-4          CHIEF JUDGE WALTER S. FELTON, JR.
                                                         JULY 1, 2014
FAIRFAX COUNTY DEPARTMENT
 OF FAMILY SERVICES


FROM THE CIRCUIT COURT OF FAIRFAX COUNTY
John M. Tran, Judge

    Wayne D. Berthelsen (Wayne D. Berthelsen, PLC, on brief), for
    appellant.

    Deborah C. Laird, Assistant County Attorney; Shirley A.
    Norman-Taylor, Guardian *ad litem* for minor children (David P.
    Bobzien, County Attorney; Peter D. Andreoli, Jr., Deputy County
    Attorney, on brief), for appellee.


       This appeal arises out of the Fairfax County Circuit Court's ("circuit court") termination of

Kathleen Mary Fabian-Cerda, a/k/a Kathleen Mary Fabian, a/k/a Kathleen Mary Fabian Cerda's

("mother") residual parental rights to her minor children, H.C. and T.C., pursuant to Code

§ 16.1-283(C)(2), by orders dated September 19, 2013.[1] On appeal, mother asserts that the circuit

court erred in terminating her residual parental rights. She argues that the Fairfax County

Department of Family Services ("the Department") failed to show by clear and convincing evidence

that she was without good cause, unwilling or unable within a reasonable period of time to remedy

---

[*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

[1] The trial court also terminated Sebastian Cerda's ("father") parental rights. Father's
appeal is also before this Court under Record Number 2030-13-4.

substantially the conditions which led to or required continuation of the foster care placement of the children. Mother also asserts that the circuit court erred in finding that the Department proved by clear and convincing evidence that it was in the best interests of the children to terminate her parental rights. Finally, mother asserts that the circuit court erred in denying her motion to strike the Department's evidence on the grounds that the Department had failed to meet its burden of proof. For the following reasons, we affirm the ruling of the circuit court terminating mother's residual parental rights pursuant to Code § 16.1-283(C)(2).

## I. BACKGROUND

On September 24, 2009, the Department received a referral alleging medical neglect of H.C. and T.C. That referral asserted that mother had failed to bring the children for two scheduled medical appointments. Both H.C. and T.C. were born prematurely.[2] H.C. suffered from severe developmental delays. T.C. had been diagnosed with congenital heart disease, Atrial Septic Defect, acid reflux, abnormal lung development, and developmental delays. Christy Rogers ("Ms. Rogers"), the Child Protective Services ("CPS") worker assigned to the case, made numerous phone calls to mother and attempted visits to the home but was unable to contact her. At the time, the family was living in the basement of father's brother's home. Mother's and father's two older children, A.C. and S.C., also lived with the family.

The Department received a second call on October 13, 2009, alleging medical neglect of T.C. who had been hospitalized with respiratory distress and diagnosed with bronchiolitis. When Ms. Rogers arrived at the hospital, staff there reported to her that mother had visited T.C. for only one hour in two days, the child did not have a pediatrician, mother was unable to provide any

---

[2] H.C. was born on September 17, 2007, at 24 weeks gestation. T.C. was born on April 9, 2009, at 27 weeks gestation.

history of medical care for T.C., and mother failed to complete Medicaid applications for the child despite help from hospital staff.

On the evening of that same day, Ms. Rogers returned to the hospital and met with mother, who became visibly distraught and angry when learning that CPS had been notified. Mother stated that she would just have to move again.[3] Medical staff at Reston Hospital reported to Ms. Rogers that mother would be unable to follow through with T.C.'s care upon her release from the hospital. Because mother had spent little time at the hospital with T.C., the medical staff was unable to educate her on the child's serious medical needs and to teach her how to use a nebulizer required for the child's care.

Ms. Rogers learned that mother had failed to follow up with any medical appointments for T.C. since July 10, 2009, and that she had neglected to have H.C. evaluated for developmental delays as recommended by Prince William County CPS in 2008. At two years of age, H.C. was not walking or talking. When mother failed to appear for her previously scheduled appointment with Ms. Rogers, the Department removed H.C. and T.C. from the parents' home on October 19, 2009, and placed them into foster care.

The Department petitioned the Fairfax County Juvenile and Domestic Relations District Court ("JDR court") on October 20, 2009, for *ex parte* emergency removal orders and filed petitions alleging that H.C. and T.C. were abused and neglected. Throughout Ms. Rogers' investigation, she was unable to contact father. The Department later learned that father owned a limousine service and transported people from Dulles International Airport to New York. He was frequently gone overnight from the family home.

On October 26, 2009, the JDR court entered preliminary removal orders granting custody of H.C. and T.C. to the Department, finding them to be neglected children. Mother was ordered to

---

[3] The family had moved several times in previous years to avoid CPS intervention.

participate in an alcohol and drug services evaluation, a psychological evaluation, and to follow all treatment recommendations. Mother was also ordered to participate in a mental health evaluation and follow treatment recommendations. Both parents were ordered to cooperate with Department services and to follow Department recommendations. The JDR court ordered an Infant Toddler Connection evaluation for H.C. and directed all parties to follow all recommendations made for the child.

On January 10, 2010, dispositional orders were entered by the JDR court, continuing legal custody of the children with the Department, continuing all prior orders in full force and effect, and approving the foster care plan with the goal of returning the children to the parents. H.C. and T.C. were placed together in a therapeutic foster home. Father completed a mental health evaluation on January 13, 2010, at the Fairfax Falls Church Community Services Board. The evaluator recommended that father develop a more detailed understanding of H.C.'s and T.C.'s medical and developmental problems, their daily health care needs, the medical plan for their care, and learn to assess mother's condition to determine whether she was competent to care for H.C.'s and T.C.'s special needs.

In February 2010, Rose Marie Alfaro, ("Ms. Alfaro"), the assigned home-based counselor, began working with mother in the home to help her become organized and to improve her parenting and coping skills. The Forensic Intervention Resource and Engagement Team also worked in the home to provide crisis intervention services. Katia Cisneros ("Ms. Cisneros") was already providing protective supervision services in the home for the couple's older children, A.C. and S.C. every other week.[4] Kara Tufts ("Ms. Tufts"), the foster care worker, assisted mother in the home

---

[4] Father cancelled meetings with Ms. Cisneros seven times before finally meeting with her in January 2010.

every two weeks, alternating weekly visits with Ms. Cisneros. Father attended only one visit with the children in March 2010 and two visits in April 2010.

In April 2010, a home-based worker was assigned to father to help him develop coping skills and to work on the parents' relationship with each other. Mother had reported that father had been physically abusive to her in the past. Father continued to be out of the home for work from Friday through Monday. When he was home during the week, he worked day jobs.

On June 8, 2010, the JDR court entered foster care review orders, continuing custody of the children with the Department, continuing all prior orders in full force and effect, and adopting a foster care plan with the goal of returning the children to their parents. Mother continued to struggle with organizing the home, frequently confusing dates and information about her children and missing their appointments. Ms. Alfaro and Ms. Cisneros developed behavioral charts and daily schedule charts with timelines and posted them in the home for mother. Despite this assistance, mother appeared to be overwhelmed and had difficulty supervising the children on her own.

In April 2011, H.C. and T.C. were returned to the home. At the second permanency planning hearing on May 2, 2011, the JDR court continued custody of the children with the Department and set another permanency planning hearing for November 1, 2011. Father continued to be away from the home for extended weekends, and mother continued to struggle to keep the home organized. When father was out of town, dirty dishes and dirty clothing piled up, and mother ran out of food and diapers for the children. While he was away, father left only twenty dollars for mother to buy necessities. Mother had no form of transportation.

Mother became resistant to visits by Ms. Tufts and Ms. Cisneros to her home, was unreachable by phone, and refused to open the door to Ms. Tufts. Eventually, mother allowed Ms. Tufts into the home. Ms. Tufts observed that H.C. and T.C. were not wearing diapers and that

T.C. had feces smeared on her bottom. During one visit, mother admitted that she had run out of diapers.

From July through September 2011, mother was unable to eliminate lice from the home despite instructions on how to do that. She missed several medical appointments for H.C. and T.C. Ms. Tufts had to schedule checkups for the children. Ms. Tufts talked to father about her concerns regarding mother's ability to supervise the children and the children's missed medical appointments. She told father that his work schedule made it difficult for him to help mother in the home. He said he had to work to earn money and it was difficult for him to cut down his work hours. Ms. Cisneros and the Court Appointed Special Advocate ("CASA") advised father that mother was unable to care for the children alone. Father again stated that he had to work. Thereafter, father and mother made some progress in attending medical appointments regularly. When father was in the home, he helped clean and cook for the family.

At the third permanency planning hearing on November 1, 2011, the JDR court returned custody of H.C. and T.C. to their parents and ordered the Department to provide protective services to the children and family. Two home-based workers were assigned to work with the family. On March 7, 2012, the Department received a referral alleging lack of supervision of S.C., then seven years old. The family preservation services worker, Yolanda Camberos, arrived at the Cerda home on March 7, 2012, at 3:45 p.m., for a scheduled home visit and observed S.C. alone in the home. Mother arrived an hour and a half later and claimed that she had gone to H.C.'s school to bring her home. Police responded to a call from Ms. Camberos to come to the home and called father. Father told police he was too busy and hung up the phone. Mother was arrested for contributing to the delinquency of a minor. The Department placed H.C. and T.C. in foster care at the home of their former foster parents.

On March 13, 2012, the JDR court entered preliminary removal orders granting custody of H.C. and T.C. to the Department. On March 22, 2012, H.C. and T.C. were found by the JDR court to be at risk of abuse and neglect. Ms. Tufts told father that he needed to be more involved with the children and to be available in the home, even on weekends.

On May 17, 2012, the JDR court entered dispositional orders continuing custody of the children with the Department, approving the foster care plan with the goal of returning the children to the home and the concurrent goal of adoption, continuing all prior orders in full force and effect. Father was ordered to be present in the home for visitation with the children and to be available in the home for parent training during the week.

The Department continued to provide services to the family. Mother appeared tired during visits with the children and when attending parenting classes. Even though her driver's license had been suspended since 2009, mother continued to drive without a valid driver's license. The home-based worker observed mother driving H.C. and T.C. without proper car seats when the children were visiting in the home.[5] Father admitted he knew that mother was not using car seats for the children.

In October 2012, mother's weekend visitation with the children was suspended. Mother told the children that a man she met on the internet wanted to meet them. The older siblings, A.C. and S.C., reported that the man claimed he would get all four of the children out of foster care. Father acknowledged that he knew mother was communicating with another man but thought it had ended.

In November 2012, mother left the home to enter Boxwood, a thirty-day residential substance abuse treatment program in Culpeper, Virginia. She had been attending a methadone clinic since 2000, and had a history of abusing pain medications. In January 2013, mother moved in

---

[5] Mother had previously been convicted of a child restraint violation in November 2011.

with a man named Martin who offered her a free place to live in Linville, Virginia. Ms. Tufts asked mother to enter counseling and to complete a urine screen prior to having visits with the children. Mother never completed a urine screen. She attended one out-patient addiction group counseling session at the local Community Services Board and then stopped attending counseling sessions.

In March 2013, father adjusted his work schedule and limited his overnight work. The children visited with father in the home with their siblings every Sunday. Noah Gigliotti ("Mr. Gigliotti"), the home-based counselor who supervised the visits, reported that father cooked and served lunch for the children during the visits. After lunch, the children played among themselves and father sat on the couch, played games on his phone, or watched television. At times, father appeared to be overwhelmed with caring for four children and would often rely on his oldest child, A.C., to care for H.C. and T.C.

On March 10, 2013, father allowed mother to stay in the home overnight and to have unsupervised contact with the children. Father reported that the children were crying so he let mother in the home. Mother told the children not to tell the Department that she was in the home. The Department was concerned that father would allow mother back in the home.

On April 11, 2013, the JDR court entered an order nonsuiting the Department's petition for permanency planning and the accompanying foster care plans with the goal of return home to father. The JDR court ordered the Department to file petitions for termination of parental rights for the children, to file new foster care plans by June 22, 2013, and to set a trial date for July 22, 2013.

On July 22, 2013, the JDR court entered orders terminating father's and mother's residual parental rights to H.C. and T.C. and approved the foster care plans with the goal of adoption. Father and mother appealed the termination and permanency planning orders to the circuit court.

On September 1, 2013, father moved into the home of his sister, Eva, in Manassas. H.C. and T.C. attended supervised visits with father and their siblings in Eva's home. On September 8,

2013, Ms. Tufts and Mr. Gigliotti were present at the visit when A.C., the older sibling, gave H.C. and T.C. her prescription medication in their sippy cups. Ms. Tufts and Mr. Gigliotti encouraged father to call Poison Control, and he reluctantly agreed. During the call, father was unable to report the children's correct ages and weights to the operator.

On September 16, 2013, the circuit court heard the parents' appeal of the JDR court orders terminating their residual parental rights. After three days of testimony, the circuit court terminated father's and mother's residual parental rights to H.C. and T.C. and entered permanency planning orders approving the foster care plans with the goal of adoption.

While in foster care, H.C. participated in an Infant and Toddler Connection evaluation. As a result of the evaluation, she received speech and language therapy, occupational therapy, and attended a special preschool program. She was seen by an ophthalmologist and diagnosed as legally blind. She attended appointments with a gastroenterologist for low weight, a neurologist for global developmental delays and seizures, a cardiologist, and a geneticist for further evaluation after being diagnosed with Rett Syndrome. At the time of the circuit court trial, H.C. was walking and talking in full sentences, unlike when she first came into foster care, and has completed kindergarten. At the time of this appeal, H.C. is six years old and has spent half her life in foster care.

Since coming into foster care, T.C. has had medical appointments with an ophthalmologist, a pulmonologist, a cardiologist, and an orthopedist. After a developmental assessment at Georgetown Hospital, T.C. began receiving physical therapy services. She was diagnosed with cerebral palsy and wears braces on her legs to help her walk. She received special education services for speech and language. At the time of this appeal, T.C. is almost five years old and has been in foster care for almost four years of her life.

## II. ANALYSIS

### A. Standard of Review

"On appeal from the termination of parental rights, this Court is required to review the evidence in the light most favorable to the party prevailing in the circuit court." Tackett v. Arlington Cnty. Dep't of Human Servs., 62 Va. App. 296, 303, 746 S.E.2d 509, 513 (2013). "When addressing matters concerning a child, including the termination of a parent's residual parental rights, the paramount consideration of a trial court is the child's best interests." Logan v. Fairfax Cnty. Dep't of Human Dev., 13 Va. App. 123, 128, 409 S.E.2d 460, 463 (1991). "The trial court's judgment, 'when based on evidence heard *ore tenus*, will not be disturbed on appeal unless plainly wrong or without evidence to support it.'" Id. (quoting Peple v. Peple, 5 Va. App. 414, 422, 364 S.E.2d 232, 237 (1988)).

### B. Failure to Substantially Remedy Conditions under Code § 16.1-283(C)

The circuit court terminated mother's residual parental rights pursuant to Code § 16.1-283(C)(2), which provides:

> The residual parental rights of a parent or parents of a child placed in foster care as a result of court commitment, an entrustment agreement entered into by the parent or parents or other voluntary relinquishment by the parent or parents may be terminated if the court finds, based upon clear and convincing evidence, that it is in the best interests of the child and that:
>
>    \*      \*      \*      \*      \*      \*      \*
>
> The parent or parents, without good cause, have been unwilling or unable within a reasonable period of time not to exceed 12 months from the date the child was placed in foster care to remedy substantially the conditions which led to or required continuation of the child's foster care placement, notwithstanding the reasonable and appropriate efforts of social, medical, mental health or other rehabilitative agencies to such end. Proof that the parent or parents, without good cause, have failed or been unable to make substantial progress towards elimination of the conditions which led to or required continuation of the child's foster care placement in accordance with their obligations under and within the time limits or

- 10 -

goals set forth in a foster care plan filed with the court or any other plan jointly designed and agreed to by the parent or parents and a public or private social, medical, mental health or other rehabilitative agency shall constitute prima facie evidence of this condition. The court shall take into consideration the prior efforts of such agencies to rehabilitate the parent or parents prior to the placement of the child in foster care.

Mother argues that she substantially remedied the conditions that resulted in H.C.'s and T.C.'s placement in foster care.

> [S]ubsection C termination decisions hinge not so much on the magnitude of the problem that created the original danger to the child, but on the demonstrated failure of the parent to make reasonable changes. Considerably more "retrospective in nature," subsection C requires the court to determine whether the parent has been unwilling or unable to remedy the problems during the period in which he has been offered rehabilitation services.

Toms v. Hanover Dep't of Soc. Servs., 46 Va. App. 257, 271, 616 S.E.2d 765, 772 (2005) (quoting City of Newport News Dep't of Soc. Servs. v. Winslow, 40 Va. App. 556, 562, 580 S.E.2d 463, 466 (2003)). However, clear and convincing evidence before the circuit court established that mother was unable to remedy the conditions during the thirty-six months H.C. and T.C. were in foster care.

The evidence showed that mother has significant cognitive difficulties from her extensive drug abuse and that the cognitive difficulties mother experiences are similar to those of someone with dementia. Mother had no understanding of why the Department was involved, no understanding of H.C.'s and T.C.'s medical disabilities, and believed she was doing well raising H.C. and T.C. Despite the Department's assistance, mother missed H.C.'s and T.C.'s medical appointments, did not drop H.C. and T.C. off at school or was late dropping them off, and was often not home when the bus dropped off H.C. and T.C. She was unable to ensure food and diapers were available for H.C. and T.C. Mother failed to complete drug screens, ceased substance abuse counseling, and does not have a driver's license or a residence of her own. Despite receiving

- 11 -

protective supervision services and the assistance of a counselor and a foster care worker, who provided her with behavioral charts and daily schedule charts for H.C. and T.C., mother was unable to meet the Department's requirements for H.C.'s and T.C.'s well-being.

Efforts to resolve the conditions that led to the removal of H.C. and T.C. are constrained by statute to be remedied within a twelve-month period. Here, mother had thirty-six months to remedy those conditions and, during that period, only made limited progress in remedying the conditions. As the circuit court noted, "[mother] is simply incapable of tending to the special needs of [H.C. and T.C.]." "It is clearly not in the best interests of a child to spend a lengthy period of time waiting to find out when, or even if, a parent will be capable of resuming his [or her] responsibilities." Kaywood v. Halifax County Dep't of Soc. Servs., 10 Va. App. 535, 540, 394 S.E.2d 492, 495 (1990). Accordingly, we conclude from the record on appeal that the circuit court did not err in terminating mother's residual parental rights pursuant to Code § 16.1-283(C)(2).

## C. Best Interests of the Children

In determining the best interests of a child, this Court has stated:

> a court must evaluate and consider many factors, including the age and physical and mental condition of the child or children; the age and physical and mental condition of the parents; the relationship existing between each parent and each child; the needs of the child or children; the role which each parent has played, and will play in the future, in the upbringing and care of the child or children; and such other factors as are necessary in determining the best interests of the child or children.

Barkey v. Commonwealth, 2 Va. App. 662, 668, 347 S.E.2d 188, 191 (1986); see Code § 20-124.3. Here, H.C. and T.C. have extensive medical and physical needs due to their premature births resulting from mother's drug addiction. H.C. receives speech and language therapy, occupational therapy, is underweight, legally blind, has global development delays and seizures, is under the care of a cardiologist and geneticist, and has been diagnosed with Rett Syndrome. T.C. has cerebral

- 12 -

palsy and wears leg braces, attends physical therapy, and receives special education services for speech and language. Both children thrived while in foster care. The circuit court stated,

> when you have children with [special] needs, there needs to be something more than beyond just simple love and care and affection. They have to be taken care of.
>
> And so while I commend the mother and I acknowledge her acceptance of her responsibility, what the bigger concern is is that having once shown to have, you know, placed trust in the parents that they would do the right thing, the [Department] was faced with the unmistakable message that the father was not -- did not believe in what it took to take care of these children.
>
> Because the [Department] had sent -- and I think the evidence was clear by March of 2013 with the mother's absence since fall of 2012, that it would subject the children to unnecessary risk of neglect, not abuse, but neglect, for them to have visits with their mother. Plus at a time when she was being asked to just simply verify certain basic information to the [Department] as to whether or not she was drug-free, the father let her into the children's lives again.
>
> \* \* \* \* \* \* \*
>
> For the mother, even though I commend her recent improvement, I find beyond a reasonable doubt that she has failed to substantially remedy the situation. And I only hope that she continues to work on . . . herself, because she has two other children who are still there who need her and her guidance in the future. But for this case, there's no doubt that the [Department] has proved it's [sic] case.

Due to the severity of H.C.'s and T.C.'s ongoing medical and educational needs, this Court concludes that the circuit court did not err in finding that it was in the best interests of H.C. and T.C. to terminate mother's residual parental rights. Over a period of three years, mother was unable to remedy the situation that led to H.C. and T.C. being placed in foster care and mother demonstrated a lack of ability to care for H.C.'s and T.C.'s medical issues. We conclude that the circuit court did not err in finding that it was in the best interests of H.C. and T.C. to terminate mother's residual parental rights pursuant to Code § 16.1-283(C)(2).

- 13 -

D.  Motion to Strike the Department's Evidence

Mother asserts that the circuit court erred in denying her motion to strike the Department's evidence.  Rule 5A:20(e) requires appellants to brief the "principles of law, the argument, and the authorities relating to each question presented."  Questions "'unsupported by argument, authority, or citations to the record do not merit appellate consideration.'"  Epps v. Commonwealth, 47 Va. App. 687, 718, 626 S.E.2d 912, 926-27 (2006) (*en banc*) (quoting Buchanan v. Buchanan, 14 Va. App 53, 56, 415 S.E.2d 237, 239 (1992)).  In Jay v. Commonwealth, 275 Va. 510, 520, 659 S.E.2d 311, 317 (2008), the Supreme Court concluded that "the Court of Appeals may . . . treat a question presented as waived" if the Court of Appeals determines the "failure to strictly adhere to the requirements of Rule 5A:20(e) is []significant."  Accord Parks v. Parks, 52 Va. App. 663, 664, 666 S.E.2d 547, 548 (2008).  "If the parties believed that the circuit court erred, it was their duty to present that error to us with legal authority to support their contention."  Fadness v. Fadness, 52 Va. App. 833, 851, 667 S.E.2d 857, 866 (2008).  Accordingly, the Court finds that mother's third assignment of error is procedurally barred by Rule 5A:20(e).

III.  CONCLUSION

For the foregoing reasons, the judgment of the trial court terminating mother's residual parental rights to H.C. and T.C. pursuant to Code § 16.1-283(C)(2) is affirmed.

Affirmed.