COURT OF APPEALS OF VIRGINIA

Present: Judges Beales, Russell and Senior Judge Frank

SHATARRA LEA DAWSON

v.      Record No. 0510-18-3

CITY OF ROANOKE DEPARTMENT
 OF SOCIAL SERVICES

MEMORANDUM OPINION*
PER CURIAM
OCTOBER 9, 2018

FROM THE CIRCUIT COURT OF THE CITY OF ROANOKE
William D. Broadhurst, Judge

(David A. Bowers, on brief), for appellant. Appellant submitting on
brief.

(Daniel J. Callaghan, City Attorney; Heather P. Ferguson, Assistant
City Attorney; Shannon L. Jones, Guardian *ad litem* for the minor
children, on brief), for appellee. Appellee and Guardian *ad litem*
submitting on brief.


Shatarra Lea Dawson (mother) appeals the order terminating her parental rights to three of

her children and approving the goal of adoption for those children. Mother argues that the circuit

court erred by (1) finding that the evidence was sufficient to terminate her parental rights pursuant

to Code § 16.1-283(B) and (C); and (2) ordering the termination of her parental rights "without

making a determination that [she] received adequate rehabilitation services while her children were

in the custody of the Department of Social Services."[1] Upon reviewing the record and briefs of the

---

* Pursuant to Code § 17.1-413, this opinion is not designated for publication.

[1] Mother argues that the circuit court erred by terminating her parental rights to her
children pursuant to Code § 16.1-283(B), (C), and (E); however, the circuit court terminated her
parental rights pursuant to Code § 16.1-283(B) and (C)(2) only. The circuit court did not
terminate her rights pursuant to subsection (E).

parties, we conclude that the circuit court did not err. Accordingly, we affirm the decision of the circuit court.

BACKGROUND

"On appeal, 'we view the evidence and all reasonable inferences in the light most favorable to the prevailing party below, in this case the Department.'" Farrell v. Warren Cty. Dep't of Soc. Servs., 59 Va. App. 375, 386, 719 S.E.2d 329, 334 (2012) (quoting Jenkins v. Winchester Dep't of Soc. Servs., 12 Va. App. 1178, 1180, 409 S.E.2d 16, 18 (1991)).

Mother has six children, and three of them, M.G., J.G., and R.D., are the subject of this appeal. On July 26, 2015, the City of Roanoke Department of Social Services (the Department) became involved with the family after receiving a call from Roanoke Memorial Hospital that J.G., who was less than one year old, had a "possible un-accidental head trauma." J.G. was diagnosed with a subdural hemorrhage, cranial nerve palsy, retinal hemorrhages to his right eye, and three fractured ribs. The injuries were consistent with shaken baby syndrome and non-accidental injury. The police conducted a non-custodial interview with mother's boyfriend, Ronnie Moore, and Moore admitted that he "played too rough" with J.G.[2] Moore told the police that he was holding J.G. and "slammed him down into the play pen." Moore acknowledged that the playpen did not have a mattress and was a hard surface. Moore felt J.G.'s "ribs pop when he slammed him in the playpen."

After the police interviewed Moore, the Department spoke with mother. Mother agreed to keep Moore away from the children. The Department subsequently sought a protective order, and the City of Roanoke Juvenile and Domestic Relations District Court (the JDR court) issued preliminary child protective orders on July 31, 2015. The preliminary child protective orders stated that Moore was to have no contact with the children. On August 7, 2015, the JDR court entered

---

[2] Moore is the biological father of mother's two youngest children, R.D. and T.D. He is not the biological father of M.G. and J.G.

additional preliminary child protective orders and found that the children were abused or neglected. On October 7, 2015, the JDR court issued final child protective orders and held that Moore was to have no contact with the children before they turned eighteen years old. The child protective services (CPS) investigation resulted in a Level 1 finding for physical abuse.

On August 19, 2016, CPS received a referral due to allegations that Moore was living in the same home as mother and the children in violation of the protective order. When the CPS worker arrived unannounced at the house, she could hear a male voice within the house; however, she did not see Moore. Mother stated that she was aware of the child protective orders and that Moore did not live in the home. Mother told the CPS worker that she did not think the child protective orders were necessary and wanted them dismissed. She explained that Moore had been to the home to visit R.D., their seven-month-old child, but M.G. and J.G. went to a neighbor's house.

On August 22, 2016, the CPS worker visited M.G. and one of mother's older children at school. The children revealed that Moore lived with them in their home. When the CPS worker confronted mother again about Moore living in the home, mother continued to deny that he lived there. Again, mother admitted that it was difficult to comply with the protective orders, and the children had had contact with Moore when he visited with R.D. The Department removed the children from mother's care and placed them in foster care because no other placements were viable at the time. The CPS investigation concluded with a Level 1 finding for physical neglect and inadequate supervision of the children against both mother and Moore.

While the children were in foster care, the Department required mother to maintain contact with the Department, provide proof of sufficient income, maintain safe and stable housing, attend visitation, complete a psychological examination, participate in individual counseling, participate in psychiatric services including medication management, participate in mental health skill building, complete a parenting class, complete substance abuse treatment, refrain from using any illegal

substances, comply with random drug screens, complete a money matters class, complete a domestic violence assessment, and comply with any other services. Mother was "somewhat compliant." Mother reported that she and Moore lived together until March 17, 2017, when he moved out, but she did not inform the Department when she moved during the summer of 2017. Mother completed the parenting class and money matters class.

The Department provided weekly visitation, and mother regularly attended visitation. On October 19, 2016, mother violated the protective orders and allowed the children to video chat with Moore during a visitation. On April 19, 2017, M.G. reported that she spoke with Moore during visitation, but mother said that she videotaped M.G. to show Moore. The Department noticed that during Moore's visitations with his children, mother would video chat and speak with Moore and tell him that she loved him. The Department's "last documented video chat [between mother and Moore] was June 21st[,] 2017 and the last confirmation of exchanging I love you over the phone was May 17th[,] 2017."

In addition to offering visitation, the Department referred mother to substance abuse counseling, which mother attended between January and July 2017. Mother told multiple providers that she used marijuana to self-medicate. Mother was subject to random drug screens; she tested positive for cocaine on January 10, 2017, and positive for marijuana on October 19, 2016; October 29, 2016; January 10, 2017; January 17, 2017; January 23, 2017; January 31, 2017; February 21, 2017; February 27, 2017; March 6, 2017; March 27, 2017; April 4, 2017; April 25, 2017; and May 1, 2017. On May 26, 2017, mother tested positive for cocaine, benzos, codeine, and marijuana, but mother claimed that she did not use illegal substances. As a result of the positive screens, mother was referred to a more intensive program in May 2017.[3] Although mother initially attended the classes, she missed two days in July 2017, and then, on August 7, 2017, her case was closed

---

[3] Mother was pregnant with her sixth child at the time.

because she had not reported as instructed. On September 14, 2017, the JDR court ordered mother to complete substance abuse treatment, but she no longer qualified for the programs because she self-reported that she had been clean since February 2017. Mother tested negative for drugs in June, September, and November 2017. Mother's counselor referred her to another provider, but mother and the other counselor never connected.

The Department also referred mother to individual counseling, and mother saw Dana McKenzie from November 4, 2016 until October 13, 2017, when her insurance changed. At the beginning of counseling, mother told McKenzie that she and Moore lived together; however, by the end of counseling, mother reported that she and Moore were no longer in a relationship. McKenzie believed that mother understood the Department's stance toward Moore, but mother did not recognize the magnitude of the concerns. Mother continued to state that Moore's actions toward J.G. were accidental. McKenzie found that mother lacked "insight and judgment as far as the severity of what happened to [J.G.] and the threat of [Moore] being around the children . . . and part of the limited insight and judgment was that she felt like her supervising [Moore] around [the children] was sufficient."

On March 9, 2017, mother participated in a psychological and parenting capacity evaluation with Dr. Klaire Mundy. Dr. Mundy diagnosed mother with bipolar disorder, general anxiety disorder, and a dependent personality disorder with anti-social and paranoid features. Dr. Mundy opined that mother "was more interested in getting her emotional needs met, . . . rather than worrying about the safety of her children and their needs." Mother told Dr. Mundy that she and Moore were in a relationship and that they intended to co-parent. At the time of the interview, mother and Moore were living together. Mother denied that there was any domestic violence and did not see a need for the protective orders. Dr. Mundy determined that mother's prognosis was "very, very poor mostly because she had no awareness of the problems that were surrounding her."

Dr. Mundy found that mother had no willingness to acknowledge that she was responsible for placing her children in harm's way because of the men she chose to be around. Mother told Dr. Mundy that she did not believe that she needed any services. Dr. Mundy concluded that mother would benefit from "multiple years of ongoing intensive work to process unresolved trauma and really kind of relearn how to engage in interaction with other human beings and how to have some self-confidence and self-worth and self-esteem."

As a result of the psychological evaluation, the Department referred mother to TAP Domestic Violence Services. On August 15, 2017, mother told the case manager that "she was not a victim of domestic violence and she did not need [their] services." Mother explained that her children were in foster care because one of them had been "abused by her ex-boyfriend," but mother did not believe that the abuse happened. The case manager scheduled a follow-up appointment, and mother did not appear.

Mother gave birth to another child, T.D., in September 2017. The Department removed the child from mother's care shortly after his birth and placed him in foster care. The Department was concerned about mother's ability to care for T.D. because of the adjudication of abuse and neglect concerning the older children, mother's continued substance abuse, her lack of progress with the other children's foster care plans, and her violations of the protective orders by allowing M.G. and J.G. to video chat with Moore during visitations.

On July 27, 2017, the JDR court entered orders approving the goals of adoption for M.G., J.G., and R.D. On November 29, 2017, the JDR court terminated mother's parental rights to M.G., J.G., and R.D. Mother appealed the matters to the circuit court.

On January 30, 2018, the parties appeared before the circuit court. The Department presented evidence about the children, who were living in a foster home. Beginning in March 2017, five-year-old M.G. started seeing a licensed professional counselor, Brenda Boyce. Boyce

diagnosed M.G. with disinhibited social engagement disorder, oppositional defiant disorder, and "probably ADHD." Boyce explained that disinhibited social engagement disorder "develops from social neglect that starts in the first months of a child's life" and essentially is caused by "[p]oor parenting and bonding" in the first couple years of life. As a result of this disorder, M.G. has demonstrated inappropriate behavior, such as an "over familiarity" with strangers, asking strangers to touch her or guess what color her underwear was, and sitting on a strange man's lap. Boyce opined that M.G. "still has a long way to go" and the prognosis for disinhibited social engagement disorder is "not that good." Boyce testified that M.G. was placed with "wonderful foster parents," who were consistent and dedicated to helping M.G. In November 2017, after the JDR court terminated mother's parental rights, Boyce recommended that M.G.'s visitation with mother stop because "the visitation was keeping her hopes up that she would be returned home to her mother."

M.G. and J.G. also had issues about holding food in their mouths for hours and were referred to counseling. M.G., J.G., and R.D. were scheduled for speech assessments. J.G. attended occupational therapy, and M.G. was scheduled for an occupational therapy evaluation. J.G. was taken to a neural developmental specialist to determine whether his aggressive behaviors were linked to the head trauma. M.G. and J.G. also required a nebulizer. On the other hand, R.D. was "thriving" and "hitting all of her developmental milestones except for her speech."

At the conclusion of the Department's evidence, mother made a motion to strike, which the circuit court denied. Mother testified about the incident on July 26, 2015 that prompted the child protective orders. Mother said that when she woke up, she noticed that J.G.'s eyes were crossed, so she took him to the emergency room. She said that she was "[d]evastated" when she learned what Moore did to J.G. Mother admitted that after the protective orders were issued, she "abided by it [sic] to [her] best ability," but sometimes, M.G. and J.G. saw Moore when he came to visit R.D. Mother testified that Moore did not live with her, but occasionally stayed with her. She explained

that their relationship as boyfriend and girlfriend ended "when the incident happened" with J.G., and she did not consider it "a relationship" when she became pregnant with Moore's child, T.D., in December 2016 or January 2017. Mother admitted to "trying" cocaine and using marijuana, but she said that she last used marijuana in December 2016. Mother also acknowledged that she did not have custody of her two oldest children.

After hearing all of the evidence and arguments, the circuit court terminated mother's parental rights to M.G., J.G., and R.D., but not T.D. The circuit court also approved the goals of adoption for M.G., J.G., and R.D. This appeal followed.

ANALYSIS

In our review of a trial court's termination of parental rights, the "trial court is presumed to have thoroughly weighed all the evidence, considered the statutory requirements, and made its determination based on the child's best interests." Castillo v. Loudoun Cty. Dep't of Family Servs., 68 Va. App. 547, 558, 811 S.E.2d 835, 840-41 (2018) (quoting Logan v. Fairfax Cty. Dep't of Human Dev., 13 Va. App. 123, 128, 409 S.E.2d 460, 463 (1991)). "Where, as here, the court hears the evidence *ore tenus*, its finding is entitled to great weight and will not be disturbed on appeal unless plainly wrong or without evidence to support it." Fauquier Cty. Dep't of Soc. Servs. v. Ridgeway, 59 Va. App. 185, 190, 717 S.E.2d 811, 814 (2011) (quoting Martin v. Pittsylvania Cty. Dep't of Soc. Servs., 3 Va. App. 15, 20, 348 S.E.2d 13, 16 (1986)).

Mother argues that the circuit court erred in finding that the evidence was sufficient to terminate her parental rights pursuant to Code § 16.1-283(B) and (C)(2). She further asserts that the Department did not provide her with "adequate rehabilitative services."

Code § 16.1-283(C)(2) states that a court may terminate parental rights if:

> The parent or parents, without good cause, have been unwilling or unable within a reasonable period of time not to exceed 12 months from the date the child was placed in foster care to remedy substantially the conditions which led to or required continuation

of the child's foster care placement, notwithstanding the reasonable and appropriate efforts of social, medical, mental health or other rehabilitative agencies to such end.

"[S]ubsection C termination decisions hinge not so much on the magnitude of the problem that created the original danger to the child, but on the demonstrated failure of the parent to make reasonable changes." Toms v. Hanover Dep't of Soc. Servs., 46 Va. App. 257, 271, 616 S.E.2d 765, 772 (2005). "Considerably more 'retrospective in nature,' subsection C requires the court to determine whether the parent has been unwilling or unable to remedy the problems during the period in which he has been offered rehabilitation services." Id. (quoting City of Newport News Dep't of Soc. Servs. v. Winslow, 40 Va. App. 556, 562-63, 580 S.E.2d 463, 466 (2003)).

Mother contends that she completed most of the Department's requirements and that the Department could have provided her with more services, but did not do so. The Department presented evidence that mother remained in a relationship with Moore after the incident with J.G. and the entry of the child protective orders. She told Dr. Mundy and the social workers that she did not believe that the child protective orders were necessary. The Department provided numerous services to mother, including referrals for a psychological and parenting capacity evaluation, individual counseling, and substance abuse treatment.

Mother completed the psychological and parenting capacity evaluation. After evaluating mother, Dr. Mundy opined that mother's "level of denial and delusional thought is pathological to the point that she does not acknowledge the concerns within her relationship, the impact her mental health has on her role as a parent, and/or the impact her aggressive relationships have on the safety and well-being of her children." Dr. Mundy concluded that mother would need years of therapy, but her prognosis was "very, very poor." Dr. Mundy recommended that mother continue with individual counseling, submit to random drug screens, and participate in additional parenting

classes. She also recommended that mother be "referred to TAP to assist with support related to the physical and emotional violence within her relationships."[4]

Mother told Dr. Mundy that she did not need any services, and in fact, refused some of the services offered. On August 7, 2017, mother's case was closed after she did not report as instructed for substance abuse counseling. The Department subsequently referred her to another provider, but mother and the other counselor never connected. On August 15, 2017, mother told the case manager at TAP that she did not need their services and did not attend the follow-up appointment. On October 13, 2017, mother stopped attending counseling because her insurance changed. She did not resume counseling.

The circuit court's final order held that mother, "without good cause, was unable to remedy substantially the conditions which led to and required the continuation of care for [M.G., J.G., and R.D.] for a period in excess of twelve months notwithstanding the reasonable and appropriate efforts of social, medical, mental health and other rehabilitative services." Contrary to mother's arguments, the circuit court did not err in finding that the Department made "reasonable and appropriate efforts" to assist mother in remedying the conditions that led to the children's continued placement in foster care. The Department offered individual counseling, psychiatric services, substance abuse treatment, domestic violence services, visitation, parenting classes, a money matters class, and a psychological and parenting capacity evaluation. Mother chose not to take full advantage of the services provided. "'Reasonable and appropriate' efforts can only be judged with reference to the circumstances of a particular case. Thus, a court must determine what constitutes reasonable and appropriate efforts given the facts before the court." Ferguson v. Stafford Cty. Dep't of Soc. Servs., 14 Va. App. 333, 338, 417 S.E.2d 1, 4 (1992). "The Department is not required 'to force its services upon an unwilling or disinterested parent.'"

_____

[4] TAP provides domestic violence services.

- 10 -

Logan, 13 Va. App. at 130, 409 S.E.2d at 463-64 (quoting Barkey v. Commonwealth, 2 Va. App. 662, 670, 347 S.E.2d 188, 192 (1986)).

At the time of the circuit court hearing, the children had been in foster care for seventeen months. The Department presented evidence that the children, especially M.G. and J.G., had special needs. M.G. required ongoing therapy for disinhibited social engagement disorder and oppositional defiant disorder. The Department also scheduled occupational therapy for M.G. and referred her for a speech assessment. J.G. attended occupational therapy and was referred to speech therapy. Both M.G. and J.G. required therapy because they held food in their mouths for hours. R.D. was thriving in foster care, although she had a speech delay. The Department referred R.D. to speech therapy.

The evidence proved that mother had not substantially complied with the Department's requirements nor remedied the conditions that led to, and required the continuation of, the children's placement in foster care. "It is clearly not in the best interests of a child to spend a lengthy period of time waiting to find out when, or even if, a parent will be capable of resuming his [or her] responsibilities." Tackett v. Arlington Cty. Dep't of Human Servs., 62 Va. App. 296, 322, 746 S.E.2d 509, 522 (2013) (quoting Kaywood v. Halifax Cty. Dep't of Soc. Servs., 10 Va. App. 535, 540, 394 S.E.2d 492, 495 (1990)). Accordingly, the circuit court did not err in terminating mother's parental rights pursuant to Code § 16.1-283(C)(2).

"When a trial court's judgment is made on alternative grounds, we need only consider whether any one of the alternatives is sufficient to sustain the judgment of the trial court, and if so, we need not address the other grounds." Kilby v. Culpeper Cty. Dep't of Soc. Servs., 55 Va. App. 106, 108 n.1, 684 S.E.2d 219, 220 n.1 (2009); see also Fields v. Dinwiddie Cty. Dep't of Soc. Servs., 46 Va. App. 1, 8, 614 S.E.2d 656, 659 (2005) (the Court affirmed termination of parental rights under one subsection of Code § 16.1-283 and did not need to address termination

of parental rights pursuant to another subsection). Therefore, we will not consider whether the circuit court erred in terminating mother's parental rights pursuant to Code § 16.1-283(B).

CONCLUSION

For the foregoing reasons, the circuit court's ruling is affirmed.

Affirmed.